C. G. WILLIS, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 95319.    Filed January 13, 1964.

*David P. Brown, Jr.*, for the petitioner.
*Stephen P. Cadden*, for the respondent.

---

[2] SEC. 107. RENTAL VALUE OF PARSONAGES.

472

OPINION

Section 1033(a) of the Internal Revenue Code of 1954[1] provides for nonrecognition of gain where property that has been "compulsorily or involuntarily converted" into money or unrelated property and the taxpayer, within a certain period, acquires replacement property that is "similar or related in service or use to the property so converted."

It appears that petitioner's realized gain on the sale of the Belvedere was $86,333.10. The original cost basis of the Belvedere in 1953 was $378,000. Petitioner was entitled to amortize 70 percent of this total (or $264,600) under section 124(a) of the Internal Revenue Code of 1939 and section 168 of the Internal Revenue Code of 1954, which sections allow a rapid amortization (based on a period of 60 months) for certain emergency facilities. However, section 1238 of the Internal Revenue Code of 1954 provides that "Gain from the sale or exchange of property, to the extent that the adjusted basis of such property is less than its adjusted basis determined without regard to section 168 (relating to amortization deduction of emergency facilities), shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231." Respondent's notice of deficiency indicates that, at the time here relevant, the adjusted basis of the Belvedere would have been $266,368.80 if normal depreciation were used, and that the adjusted basis with the use of rapid amortization, as shown by petitioner's books, was $108,666.90. None of these amounts is disputed by petitioner. Since the actual adjusted basis of the Belvedere is $157,701.90 ($266,368.80 minus $108,666.90) less than its adjusted basis without regard to the rapid amortization provisions, it would appear that the entire gain of

---

[1] All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. \* \* \*

$86,333.10 realized on the sale of the Belvedere would be taxable as ordinary income unless, of course, the nonrecognition provisions of section 1033(a) apply.

To qualify under section 1033(a) the taxpayer must establish an *involuntary* conversion of his property. Included in the parenthetical portion of the statute are such conversions of property that result from "its destruction in whole or in part." There was an involuntary conversion here in that there was an "in part" destruction of the property. In the year 1957 petitioner had been paid $100,000 in partial settlement for this involuntary conversion. The ship was fully insured so the 1957 involuntary conversion (destruction in part) was a conversion of part of the property into money. It resulted in no gain because petitioner's basis, even with the fast writeoff, was $108,666.90. Thus, at the close of 1957 petitioner owned an unrepaired ship with the basis reduced to $8,666.90 ($108,666.90 less $100,000 insurance paid in 1957) and a claim against the insurer in an undetermined amount.[2] In 1958 it sold the unrepaired ship for $100,000.

Respondent's determination treats the 1958 sale of the damaged ship as a voluntary sale for a net of $95,000 ($100,000 less $5,000 sale expense) and computes the gain as $86,333.10, using a basis of $8,666.90. Petitioner does not dispute the figures but argues the 1958 sale of the damaged ship was also an involuntary conversion within the meaning of section 1033 and that the insurance recovery and sale proceeds should be treated as one sum received from an involuntary conversion and all invested in property, a barge, that was similar or related in service and use to the property it replaced. It is obvious that the issue of whether the proceeds from the insurance paid in 1957 and sale made in 1958 were invested in "other property similar or related in service or use" will not be reached unless it first be held the sale of the damaged ship in 1958 was an involuntary conversion within the meaning of section 1033. We are convinced it was not.

The wording of the statute makes it plain that it does not include conversions or sales of property where the owner had a choice of keeping the property or converting or selling it. In *S. E. Ponticos, Inc.*, 40 T.C. 60, this Court said that the "basic purpose of section 1033(a)(3)(A) undoubtedly is to allow the taxpayer to replace his property or continue his investment without realizing gain where he is compelled to give up such property because of circumstances beyond his control." Petitioner argues the damage was so extensive that it was justified in selling the vessel in its damaged condition rather than attempt to repair it. There is testimony here that indicates petitioner made a sound business judgment when it decided to sell instead of repair after it settled with the insurance company. That very argument

---

[2] It settled the insurance claim in 1961 for $38,870.

defeats its contention that the sale was involuntary. It cannot be said that the sale of the unrepaired ship was a "result" of its partial destruction. The sale was the result of a business decision by the owner that the money equivalent of the unrepaired ship would serve its business interests better. The record shows that after the mishap the ship was repairable. Initial bids for repairs were in the range of $100,500 to $120,000. Subsequently it was found that additional repairs of $38,876 would be needed to restore the vessel to its condition prior to the collision.

We do not believe that such damage to the vessel compelled petitioner to sell the vessel in 1958 so that the whole transaction would amount to an involuntary conversion within the meaning of the statute. On the contrary, the record suggests that the decision to sell the Belvedere was actually dictated by other motives. Petitioner owned one other motor vessel in addition to the Belvedere. The rest of petitioner's fleet consisted of seven barges and five tugs. The motor vessels required a crew of about 14 men, while the barges required no crew. Yet the barges were able to transport substantially larger cargoes over the same routes served by the motor vessels. Prior to the mishap, petitioner had made attempts to dispose of the Belvedere. In 1958 the petitioner was compelled to tie up its remaining motor vessel for business reasons, and it appears from the evidence that this motor vessel was not in use at the time of trial. The petitioner certainly had a strong economic incentive, completely unrelated to the damages caused by the collision, to sell the Belvedere. Petitioner's executive officer admitted that it was "common knowledge" the various shipyards that bid on the repairs to the Belvedere could have restored the vessel to usability. It also appears that as late as January 1962 the Belvedere was in the possession of a company in the West Indies and that its owners considered its value to be about $175,000.

We have considered the testimony of petitioner's witness, a consulting marine engineer, who inspected the Belvedere on August 28, 1957, when the vessel was already in drydock. We do not consider his testimony very helpful. His broad statement that, in his opinion, the vessel would have proved a "constructive total loss," which he defined as "useless for the purpose for which it was built," is simply unsupported by anything in the record. The witness admitted that such a total loss would mean that the entire policy coverage of the vessel would be paid to petitioner, yet it is stipulated that petitioner received no more than $138,870 from the insurance underwriters.[3]  The witness

---

[3] This same witness represented petitioner in perfecting the claims against the insurance underwriters for settlement.  It is stipulated that on August 11, 1957, the Belvedere was insured for $400,000.  It is also stipulated that "The value of the 'Belvedere' was $390,000.00 on August 11, 1957, as determined on March 21, 1958, by Frank S. Martin & Son, Ship and Engineer Surveyors, Consulting Engineers and Appraisers, New York, New York."

also testified that even if all repairs were made to the Belvedere, there would be future operational difficulties with the vessel. As to this he was rather vague, testifying that after damage such as was sustained by the Belvedere "there are always little things going out of order caused by distortion perhaps of, say, a propeller shaft structure, things that might be pushed out of place by thousandths of an inch that one cannot see and cannot check, but they can really vitally affect the future operation of a vessel." Such testimony is not persuasive to establish that petitioner was compelled to sell the damaged vessel.

Involuntary conversion, within the meaning of section 1033(a), means that the taxpayer's property, through some outside force or agency beyond his control, is no longer useful or available to him for his purposes.[4] On the record before us, we do not believe that the sale of the unrepaired Belvedere amounts to a forcible taking of petitioner's property. We hold the Belvedere was not "compulsorily or involuntarily converted" within the meaning of section 1033(a) and that petitioner is not entitled to the nonrecognition of gain provisions of that section.

*Decision will be entered under Rule 50.*

---

[4] We do not know the uses to which the Belvedere was put after 1958 by its new owners in Cuba and in the West Indies. It may well be that the vessel was placed in ocean-going trade, as opposed to the Intercoastal Waterway System where petitioner operated. Under such a circumstance it would be odd to maintain that the vessel, as a result of its mishap, was no longer useful for transport on the waterway.

