109 T.C. No. 21


UNITED STATES TAX COURT


LAKEWOOD ASSOCIATES, ROBERT G. MOORE, TAX MATTERS PARTNER,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24656-93.                    Filed December 29, 1997.


       L, a partnership, purchased land on which it
intended to build single-family residences.  At the
time of purchase, the land was zoned for agricultural
use and one-third of the land was wetlands under
Federal wetland regulations.  In 1988, L applied for
rezoning of the land to residential, and in 1989, L's
rezoning application was denied.  Also in 1989, new
Federal wetland regulations were issued that resulted
in about 75 percent of the land's being classified as
wetlands.  L is required to obtain a permit under the
Clean Water Act of 1977, Pub. L. 95-217, sec. 67(a)
(commonly called a section 404 permit), 91 Stat. 1566,
1600, 33 U.S.C. sec. 1344 (1994), before beginning the
residential project on the wetland portion of the land.
L did not apply for a permit in 1989, and L did not
sell or abandon the property.  The land remains zoned
for agricultural use.  L claimed a loss deduction under
sec. 165, I.R.C., in 1989 for the decrease in property
value of the land based on its inability to use the

land for residential development because of the Federal wetland regulations.

     <u>Held</u>:  There has not been a realization event that fixes the decrease in property value in a closed and completed transaction, and L is not entitled to a loss deduction under sec. 165(a), I.R.C.

<u>Douglas E. Kahle</u>, for petitioner.

<u>John C. McDougal</u>, for respondent.

GERBER, <u>Judge</u>:  Respondent issued a notice of final partnership administrative adjustments to Lakewood Associates for taxable year 1989.  The issue for our consideration is whether Lakewood Associates is entitled to a loss deduction under section 165[1] in 1989 for a decrease in the value of real property alleged to have been caused by restrictions imposed on its ability to develop the property by Federal wetland regulations that were issued in that year.[2]

### FINDINGS OF FACT[3]

Lakewood Associates (Lakewood) is a Virginia general partnership with its principal place of business in Virginia

---

[1]All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2]In an earlier opinion, respondent's motion for summary judgment was denied.  See <u>Lakewood Associates v. Commissioner</u>, T.C. Memo. 1995-552.

[3]The parties' stipulation of facts and the attached exhibits are incorporated by this reference.

Beach, Virginia, at the time the petition was filed. In 1987, Lakewood purchased approximately 632 acres of unimproved real estate located on Elbow Road in Chesapeake, Virginia, to construct single-family homes in a residential development to be called Elbow Lake Estates (Elbow Lake property). Lakewood purchased the property from R.G. Moore Building Corp. (Moore Corp.) for a purchase price of $8,860,000 and granted Moore Corp. a 55-percent general partnership interest in the Lakewood partnership. Lakewood intended to develop the property in conjunction with an adjacent 59.7-acre property, the Boy Scout Tract, owned by Lakewood's tax matters partner, Robert G. Moore. Mr. Moore has been a real estate developer and contractor for over 40 years.

At the time Lakewood acquired the property, it was zoned for agricultural use. On February 8, 1988, Lakewood applied for rezoning of the Elbow Lake property from an agricultural district to a single-family residential district. Following a public hearing, a staff report to the Chesapeake Planning Commission recommended that the Commission deny Lakewood's proposed rezoning because the proposed residential development would create traffic and education demands that could not be met by Lakewood's or the city's budget. In addition, the staff report cited problems with the planned sewer system on the property, which did not meet city requirements, and the local government's inability to serve the

residents of the proposed development.  Based on the staff's recommendation, in September 1988, the Planning Commission recommended to the Chesapeake City Council (City Council) that Lakewood's rezoning application be denied.  In October 1988, however, the City Council approved Lakewood's rezoning application contingent on certain proffers.

Residents of Chesapeake, Virginia, mounted a petition drive against the rezoning and, after obtaining the required 15 percent of voters' signatures, requested that the City Council repeal the approved rezoning of Lakewood's Elbow Lake property.  The City Council voted not to repeal the rezoning.  On March 7, 1989, a voter referendum was held on whether or not to rezone the Elbow Lake property as mandated by the Chesapeake City Charter.  The proposed rezoning was defeated by the voter referendum with over 95-percent voting against rezoning the property for residential use.  The referendum was subsequently upheld by the Virginia Supreme Court in an opinion filed April 20, 1990, in which the court found that the referendum provisions of the City Charter apply to zoning ordinances.  R.G. Moore Bldg. Corp. v. Committee, 239 Va. 484, 391 S.E.2d 587 (1990).  Lakewood did not make any subsequent attempts to rezone the Elbow Lake property from the time of the voter referendum defeating the residential zoning to the time of trial.

The Elbow Lake property is bordered by a swamp and contains wetlands that are protected from development by Federal law. Protected wetlands are subject to the jurisdiction of the Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps). To develop protected wetlands, a real estate developer must obtain a permit from the local division of the Corps under the Clean Water Act of 1977, Pub. L. 95-217, sec. 67(a) (commonly called a section 404 permit), 91 Stat. 1566, 1600, 33 U.S.C. sec. 1344 (1994), before commencing any construction that causes discharge of dredge or fill material on wetlands.[4] See 33 U.S.C. sec. 1344 (1994). In 1987, the Corps published a manual defining protected wetlands, Federal Manual for Identifying and Delineating Jurisdictional Wetlands (1987 Manual). The Norfolk Division of the Corps, which has local oversight of the Chesapeake, Virginia, area, followed the 1987 Manual to identify wetlands and to process section 404 permit applications. Use of the 1987 Manual by a local division of the Corps was not mandatory.

In late 1987 through 1988, Lakewood employed Douglas S. Davis, a wetlands scientist and consultant, to determine the

-----

[4]People associated with environmental wetlands issues popularly refer to the required permit as a sec. 404 permit. Sec. 404 refers to the section of the Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, sec. 404, 86 Stat. 816, 884, that previously provided for the permit requirement and was replaced by sec. 67(a) of the Clean Water Act of 1977, Pub. L. 95-217, sec. 67(a), 91 Stat. 1566, 1600.

portion of the Elbow Lake property that constituted protected wetlands under the 1987 Manual. In a preliminary report prepared in February 1988, Mr. Davis identified approximately one-third of the property as wetlands. The Corps performed an on-site investigation of the property in early spring of 1988 and advised Mr. Davis that it was necessary to measure the level of ground water to determine whether additional wetlands exist on the interior of the property. After completing the ground water monitoring, Mr. Davis prepared an addendum to the preliminary report which found that the water levels on the property met the parameters of protected wetlands.

In January 1989, the Corps adopted a new wetlands manual (1989 Manual), effective as of March 1989, that superseded the 1987 Manual. The 1989 Manual amended the definition of protected wetlands, substantially increasing the area of land considered to be protected wetlands and over which the Corps asserted jurisdiction. Use of the 1989 Manual by a local division of the Corps was mandatory. In August 1990, Lakewood engaged the engineering firm of Langley and McDonald to determine the amount of wetlands on the Elbow Lake property under the 1989 Manual. Langley and McDonald determined that wetlands covered approximately 74 percent of the property pursuant to the 1989 Manual.

In November 1989, the Corps also entered into a Memorandum of Agreement (MOA) with the EPA that establishes the procedures to be used by the Corps staff in reviewing section 67(a) (section 404) CWA permit applications. Specifically, the MOA articulated the policy and procedure necessary to satisfy section 404 so that the local field offices of the Corps would be using consistent standards in processing permit applications. The MOA provided a three-step process for obtaining a section 404 permit: (1) Avoidance, (2) minimization, and (3) compensatory mitigation. In the first stage, avoidance, the applicant must avoid any impact on protected wetlands, for example, by developing around the wetland area or using an alternative site for development whether or not owned by the applicant. In the minimization stage, the applicant must minimize the impact on wetlands from the proposed development and must justify the extent that the development will impact wetlands. Third, in the compensation stage, the applicant is required to offset the impacted wetlands, for example, by creating wetlands to replace those being impacted by the development project.

The MOA did not change the substantive regulatory requirements for obtaining a section 404 permit as the three above requirements had been a part of the regulatory scheme since at least 1984. However, the MOA provided that the requirements must be met in the above sequence. The effect of the MOA was to

reduce the Corps' flexibility in processing section 404 permit applications and to make it more difficult and costly for real estate developers to obtain permits.  The MOA was originally to take effect on December 15, 1989, but the effective date was postponed to February 7, 1990.  An application for a section 404 permit that was filed in 1989 would not have been subject to the MOA.

Lakewood first filed an application for a section 404 permit for the Elbow Lake property on January 28, 1991, pursuant to the terms of the 1989 Manual.  The permit application proposed a residential subdivision consisting of 433 lots of which 321 lots were to be situated on wetlands as defined in the 1989 Manual. Lakewood's application did not contain the required information for the Corps to process the application, such as a map of the precise boundaries on the wetlands on the property.  The Corps was unable to process the application and requested additional information from Lakewood in two letters on April 29 and June 24, 1991.  In a August 16, 1991, letter, the Corps notified Lakewood of its intent to withdraw administratively  Lakewood's application in 30 days if Lakewood did not respond to the Corps' previous requests for information.  Thereafter, on September 15, 1991, the Corps administratively withdrew Lakewood's permit application.  Lakewood decided not to pursue the application because it had been advised by wetland experts that it would be

unable to obtain a permit for development of the Elbow Lake property under the 1989 Manual requirements. As a consequence, Lakewood did not want to incur the expense of completing the permit application.

In 1991, the Corps ceased use of the 1989 Manual per statutory requirements in the Energy and Water Development Appropriations Act of 1992, Pub. L. 102-104, 105 Stat. 510 (1991). As of September 1991, the Corps reverted to using the 1987 Manual, which became mandatory for local divisions of the Corps. All permit applicants with applications pending at that time and subject to the 1989 Manual were given the option to resubmit their applications under the 1987 Manual. Lakewood met with representatives of the Corps in 1992 and 1993 regarding delineation of wetlands on the Elbow Lake property under the 1987 Manual.

Lakewood's adjusted basis in the Elbow Lake property was $13,268,320. On its 1989 income tax return, Lakewood treated the issuance of the 1989 Manual as a regulatory taking, or condemnation, of the Elbow Lake property and claimed an ordinary loss deduction under sections 165 and 1231(a) with respect to the property in the amount of $9,849,682. The amount of the claimed loss deduction represents approximately 74 percent of Lakewood's adjusted basis in the property, which is the portion of the Elbow Lake property determined to be protected wetlands under the 1989

Manual. Lakewood's tax matters partner Robert G. Moore who owned the Boy Scout Tract adjacent to the Elbow Lake property also claimed a section 165 loss deduction in 1989 with regard to the Boy Scout Tract due to the issuance of 1989 Manual.

OPINION

The issue for our consideration is whether Lakewood is entitled to a loss deduction in 1989 because of the issuance of the 1989 Wetlands Manual and MOA. Petitioner argues that Lakewood is entitled to a deduction in the amount of the decrease in value of the Elbow Lake property as a result of being prevented from developing the property for residential use under the Federal wetland regulations. Petitioner contends that Lakewood's inability to use its property for the purpose Lakewood intended when it purchased the property constitutes an involuntary conversion of property. Accordingly, petitioner contends that Lakewood is entitled to a loss deduction under section 165. On its 1989 tax return, Lakewood characterized the loss as a governmental taking of property upon the issuance of the 1989 Manual and the execution of the MOA. On brief, however, petitioner contends that a constitutional taking of the property is not required in this case to establish a deductible loss under section 165.

Section 165(a) permits a deduction for any loss sustained during the taxable year and not compensated for by insurance or

otherwise.  Section 1231(a) governs the characterization of gains and losses from sales, exchanges, and involuntary conversions of real and depreciable property used in a trade or business and permits a taxpayer, in certain circumstances, to characterize recognized losses incurred from such transactions or occurrences as an ordinary loss rather than a capital loss subject to the limitations on deductibility under section 165(f).

For purposes of section 165(a), a loss must be evidenced by a closed and completed transaction and fixed by an identifiable event.  Sec. 1.165-1(b), Income Tax Regs.  The mere diminution in value of property is not sufficient to establish a loss for purposes of section 165(a).  United States v. White Dental Manufacturing Co., 274 U.S. 398 (1927).  To deduct a decrease in value of property, there must be some event that fixes the fact of the loss and the amount thereof.  Petitioner contends that an involuntary conversion of property is an identifiable event that gives rise to a section 165 loss deduction.  Petitioner contends that an involuntary conversion of property occurs when a "taxpayer's property, through some outside force or agency beyond his control, is no longer useful or available to him for his [purposes]" quoting C.G. Willis, Inc. v. Commissioner, 41 T.C. 468, 476 (1964), affd. 342 F.2d 996 (3d Cir. 1965), which involved nonrecognition of gain upon an involuntary conversion under section 1033.  Petitioner also quotes a similar definition

of an involuntary conversion in <u>Grant Oil Tool Co. v. United States</u>, 180 Ct. Cl. 620, 381 F.2d 389, 395 (1967), which provides that an involuntary conversion of property occurs for purposes of the section 1231(a) gain and loss characterization rules when property is "[rendered] * * * useless for the purpose[s] for which it was intended" regardless of whether the property is in fact physically destroyed.

Petitioner argues that an involuntary conversion occurred upon the issuance of the 1989 Manual and the execution of the MOA for purposes of section 165 because Lakewood could no longer use the Elbow Lake property for residential development as it had intended. Respondent does not dispute that under the 1989 Manual the amount of protected wetlands on the Elbow Lake property increased or that the 1989 Manual and MOA made it more difficult to obtain a section 404 permit. Respondent argues that the advent of the 1989 Manual and MOA are not identifiable events that establish a closed and completed transaction for loss recognition purposes under section 165.

Respondent presents a series of independent arguments against Lakewood's claimed loss deduction for the decrease in value alleged in this case. Respondent's principal position is that the agricultural zoning of the Elbow Lake property prevented Lakewood's intended residential use of the property. Accordingly, respondent maintains that Lakewood would not have

been able to build single-family residences on the Elbow Lake property even in the absence of the stricter Federal wetlands regulations contained in the 1989 Manual and MOA.  We agree with respondent's first argument to the extent that, in substantial part, it was the zoning limitation that restricted the intended use of the property.  In that regard, the 1989 Manual and the MOA would have had a relatively small effect, if any, on the property when used for agricultural purposes.  In any event, petitioner has not advanced an alternative theory or provided us with a factual predicate for a finding that the 1989 Manual and the MOA caused a reduction in value for agricultural purposes.

Lakewood faced two obstacles to its residential development project:  (1) Local zoning law, and (2) Federal wetland regulations.  The Elbow Lakes property was zoned as an agricultural district at the time Lakewood acquired it.  In 1988, Lakewood applied for rezoning of the property from agricultural to residential.  After the City Council initially approved the rezoning, the rezoning was overwhelmingly defeated in a voter referendum in 1989, the year that Lakewood claimed the loss deduction on the property.  Lakewood has not applied for rezoning of the property to residential since this unsuccessful attempt, and the Elbow Lake property had retained its agricultural zoning up to the time of trial.

Petitioner presented the expert testimony of a real estate appraiser, Bruce Hatfield, to the effect that the value of the property decreased in 1989 from about $11 million to $1 million as a result of the 1989 Manual and MOA.  Mr. Hatfield's valuation is based on his conclusion that the highest and best use of the Elbow Lake property is residential development and that the property could be rezoned from agricultural to residential.  The fair market value of property is a question of fact for which the burden of proof is on petitioner.  Symington v. Commissioner, 87 T.C. 892, 896 (1986).  The fair market value of property is based on the highest and best use for the property on the date of valuation regardless of whether the property is actually being used for that purpose or the land owner intended to put the property to that use.  Frazee v. Commissioner, 98 T.C. 554, 563 (1992); Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). Rather, "The realistic, objective potential uses" of the property control.  Stanley Works v. Commissioner, supra at 400.  The highest and best use is a reasonable and probable use of the property in the near future.  Frazee v. Commissioner, supra. Restrictions on a land owner's right to use the property are relevant in determining whether the identified highest and best use of the property is reasonable.  Stanley Works v. Commissioner, supra at 402.  Accordingly, petitioner must prove that it was reasonable and probable that the Elbow Lake property

could be rezoned for residential development within reasonable proximity to the year in issue.

Mr. Hatfield examined the growth patterns and population shifts in the Chesapeake, Virginia, area and determined that the Elbow Lake property could be part of the ongoing residential development in that area. He believed that the property could be rezoned for residential purposes because property located in close vicinity to the Elbow Lake property had been rezoned from agricultural to residential shortly after Lakewood's application for rezoning was defeated. Petitioner's expert attributed the ability of the Chesapeake, Virginia, citizens to defeat the residential rezoning of the Elbow Lake property to luck, testifying that opponents of the rezoning were able to obtain the required 15 percent of voters' signatures for the petition because they collected the signatures of voters at polling sites during a general election. The expert did not assert any special expertise in zoning issues and merely concluded that since other property had been rezoned, the chances for rezoning the Elbow Lake property were good. Mr. Hatfield did not discount the value of the property prior to the 1989 Manual and MOA for the possibility that the property could not be rezoned for residential use.

Despite the expert's opinion, we cannot ignore the agricultural zoning of the Elbow Lake property and Lakewood's

failed attempt to rezone the property for residential purposes during the year in issue. The Planning Commission and staff opposed residential zoning of the property, recommending to the City Council to deny the rezoning request. In 1989, Lakewood's proposed rezoning of the Elbow Lake property was overwhelmingly defeated by 95 percent of the voters in the referendum. Petitioner has not presented a persuasive reason to believe that the City Council would ignore this near-unanimous, clear public objection to residential zoning of the Elbow Lake property and approve a subsequent rezoning application for the property. Moreover, at the time of trial, the Elbow Lake property was still zoned for agricultural use. We conclude that a change in the zoning of the Elbow Lake property was not probable at the time of the claimed deduction or within a reasonable period of time thereafter. Lakewood's proposed development of the Elbow Lake property was prohibited in 1989 because of the local zoning ordinance, which predates the 1989 Manual, regardless of the 1989 Manual and MOA. Accordingly, the 1989 Manual and MOA did not cause the $9 million reduction in the value of the Elbow Lake property claimed by Lakewood.

We find that the continued agricultural zoning of the Elbow property resulted in a $1 million value of the property in 1989. In that regard, we must determine whether Lakewood is entitled to deduct either the difference between the basis and $1 million or

any reduction in value caused by Government land use regulations.

The mere diminution in value of property does not create a deductible loss. An economic loss in value of property must be determined by the permanent closing of a transaction with respect to the property. A decrease in value must be accompanied by some affirmative step that fixes the amount of the loss, such as an abandonment, sale, or exchange. The barrier to Lakewood's intended use for the property because of zoning regulations is the lack of a closed and completed transaction for purposes of section 165. When Lakewood purchased the Elbow Lake property, it acquired certain rights with respect to the property. Lakewood's right to use the property was limited because the Elbow Lake property was then zoned for agricultural use. After the zoning application was defeated, Lakewood had not been denied a right that it previously possessed. Lakewood paid an amount for the Elbow Lake property in excess of the $1 million agricultural use value under the belief that the property could be rezoned for residential development. Such an assumption, whether reasonable or not, is not grounds for a loss deduction under section 165 when the assumption is proved to be in error. Land use regulations are akin to market conditions that are constantly subject to change. If we treated an adverse zoning decision or land use regulation as a loss realization event, it would then be necessary to treat increases from these sources as a taxable gain

to the property owner.  Rather, we hold that until the Elbow Lake property is sold, abandoned, or otherwise disposed of in a completed transaction, Lakewood is not entitled to a loss deduction.  Until such a time, it is impossible to determine accurately whether in fact Lakewood suffered a loss on the property or the amount of the loss.  Because Lakewood continued to own the property, there was not a closed and completed transaction with regard to the Elbow Lake property in 1989 that triggered loss recognition for the $9 million decline in value.

Moreover, allowing Lakewood to deduct the diminution in value caused by land use regulations would be inconsistent with the other grounds for a loss deduction that exist under section 165; i.e., abandonment and obsolescence.  Section 165 provides for a loss deduction for obsolescence of nondepreciable property used in a trade or business where the property is permanently discarded from use by the taxpayer.  Sec. 1.165-2, Income Tax Regs.  In addition, a deduction is permitted for an abandonment loss where the taxpayer intends to abandon the property and has taken an affirmative act of abandonment.  Citron v. Commissioner, 97 T.C. 200, 208 (1991).  Lakewood has not permanently discarded or abandoned the Elbow Lake property.  Rather, Lakewood filed a permit application in January 1991, after the year in issue.  In 1992, Lakewood renewed discussions with the Corps regarding the determination of wetlands on its property.  In 1993, Lakewood

provided a delineation of wetlands to the Corps as required for the permit, and the Corps confirmed the delineation.  These actions show that Lakewood has not abandoned the property.  The property has continued to be held by Lakewood for future use or sale.  We hold that there was not a loss realization event with respect to the zoning laws.

To characterize the loss as ordinary under section 1231, petitioner at very least, would have to show that land use regulations constitute an involuntary conversion.  Section 1.1231-1(e), Income Tax Regs., defines involuntary conversion of property as follows:

> the conversion of property into money or
> other property as a result of complete or
> partial destruction, theft or seizure, or an
> exercise of the power of requisition or
> condemnation, or the threat or imminence
> thereof.  Losses upon the complete or partial
> destruction, theft, seizure, requisition, or
> condemnation of property are treated as
> losses upon an involuntary conversion whether
> or not there is a conversion of the property
> into other property or money * * *

Government land use regulations, such as local zoning law or Federal wetland regulations, rarely constitute a condemnation of property under eminent domain powers.  See Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992); United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985); Agins v. City of Tiburon, 447 U.S. 255 (1980).  Condemnation requires property to be taken against the taxpayer's will by a public or quasi-

public entity exercising the power of eminent domain. Koziara v. Commissioner, 86 T.C. 999, 1006-1007 (1986), affd. 841 F.2d 1126 (6th Cir. 1988). A condemnation or involuntary conversion of property as defined under section 1231 has not occurred in this case.

Considering the question of the effect of the 1989 Manual and the MOA, it was possible that they adversely affected the value of the Elbow Lake property for agricultural use, causing a reduction in value of the property below the $1 million determined by petitioner's expert. Petitioner, however, only argues that the newly issued Federal wetland regulations prevented Lakewood's use of the Elbow Lake property for residential development and contends that the value of the land is $1 million based on agriculture as the highest and best use of the property.

At trial, petitioner presented four wetlands experts who provided credible and convincing testimony that it was highly unlikely that Lakewood would be granted a section 404 permit by the Corps to develop single-family residences on the Elbow Lake property. One expert, Bernard Goode, who was employed as an engineer by the Corps for 34 years, believed that there was a "very low likelihood" that under the 1989 Manual, the Corps would grant a section 404 permit to Lakewood for the proposed residential development or that Lakewood's residential project

could have been developed in an economically feasible manner. Mr. Goode's testimony was corroborated by the other expert witnesses who testified that it would be "virtually impossible" to obtain a section 404 permit or to develop the Elbow Lake property after the 1989 Manual. Conversely, petitioner's experts also believed that Lakewood could have obtained a section 404 permit under the terms of the 1987 Manual and could have developed the Elbow Lake property for residential purposes in an economically feasible manner. Petitioner has not argued that Lakewood could not use the Elbow Lake property for agricultural use because of the terms of the 1989 Manual and the MOA or that the Federal regulations affected Lakewood's use in any way other than preventing real estate development. Petitioner has chosen not to argue that there was a partial regulatory taking of the Elbow Lake property that would constitute a realization event for the loss in value of the property. Moreover, petitioner's own expert witness testified that the property was not worthless as agricultural property after 1989. Accordingly, we find that Lakewood is not entitled to the loss deduction claimed.[5]

On July 10, 1997, after the briefs were filed in this case, respondent filed a motion to reopen the record to permit the

---

[5] Although we are not factually compelled to address the question of whether the Federal wetland regulations cause a tax recognizable event, it appears that the result would be no different from that of a zoning limitation.

introduction of a certified copy of a petition filed by Lakewood Associates on April 28, 1997, in the U.S. Court of Federal Claims. The petition seeks compensation in the amount of $10 million under the Fifth Amendment takings clause for the regulatory taking of the Elbow Lake property as a result of the issuance of the 1989 Manual. On brief, petitioner had maintained that Lakewood had abandoned any claim for reimbursement under the Fifth Amendment for the loss in value of the Elbow Lake property caused by a regulatory taking. The petition that respondent seeks to enter into evidence relates to the issue of whether Lakewood would have a reasonable prospect to recovery for any loss that it sustained due to the 1989 Manual and the MOA. Due to our holding in this case, we need not address the merits of respondent's motion to reopen the record and deny it as moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent.</u>