118 T.C. No. 7

UNITED STATES TAX COURT

WILLAMETTE INDUSTRIES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20094-97, 7712-99.     Filed February 12, 2002.

Some of P's trees were partially damaged and P was compelled to salvage the trees or they would have been lost through decay, insects, etc. The damage forced P to harvest the trees before intended. P had several alternatives for salvage and chose to process the damaged trees into the end products that it normally produces. P, under sec. 1033, I.R.C., seeks to defer only the portion of the gain attributable to the difference between P's basis and the fair market value of the damaged trees in place. P does not seek to defer the part of the gain attributable to the processing of the trees or manufacturing of the end products. R determined that P is not entitled to defer any gain because P's ability to use the damaged trees in the ordinary course of its business resulted in a conversion that was not "involuntary" within the meaning of sec. 1033, I.R.C. P contends that it was not its intent to harvest the trees in the taxable year under consideration and that the damage caused an involuntary conversion within the meaning of sec. 1033, I.R.C.

        Held:  P's circumstances meet the threshold
requirements for relief under sec. 1033.



    Philip N. Jones and Peter J. Duffy, for petitioner.

    William A. McCarthy, for respondent.



OPINION

    GERBER, Judge:  The parties filed cross-motions for partial summary judgment.[1]  The controversy concerns whether petitioner is entitled to defer gain resulting from the salvage (processing and sale) of damaged trees under section 1033.[2]  The parties have agreed on the salient facts.  The controverted issue involves a legal question that is ripe for summary judgment.[3]

---

    [1] Respondent first moved on Oct. 27, 2000, for partial summary judgment.  The parties subsequently reached an agreed set of facts and issues.  After the agreement, petitioner, on Apr. 26, 2001, filed its motion for partial summary judgment, which properly frames the issues.  Respondent objected to the granting of petitioner's motion and, on June 14, 2001, advanced a cross-motion for partial summary judgment.  Petitioner was also afforded an opportunity to address respondent's cross-motion.  Accordingly, respondent's motion for partial summary judgment, filed Oct. 27, 2000, is deemed moot.

    [2] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

    [3] Rule 121; Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); Zaentz v. Commissioner, 90 T.C. 753, 754 (1988); Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988); Naftel v. Commissioner, 85 T.C. 527, 529 (1985).

Background

Petitioner is an Oregon corporation with its principal office in Portland, Oregon. Petitioner operates a vertically integrated forest products manufacturing business, which includes the ownership and processing of trees (raw materials) at various types of manufacturing plants, including lumber mills, plywood plants, and paper mills. The raw materials used in the manufacturing process are derived from petitioner's trees and from trees grown by others. Approximately 40 percent of petitioner's timber needs is acquired from petitioner's timberland, which comprises 1,253,000 acres of forested land.

Petitioner suffered damage to some of its standing trees during each of the years in issue, 1992-95. The damage was caused by wind, ice storms, wildfires, or insect infestations. The damage left part of petitioner's damaged trees standing and part of them fallen. The intended use of the trees was continued growth and cultivation until maturity, at which time the trees would have been systematically and efficiently harvested. The damage occurred prior to the intended time for harvest.

Petitioner salvaged its damaged trees to avoid further loss (from decay, insects, etc.) by means of the following steps: (1) Taking down damaged trees that remained standing; (2) cutting damaged trees into standard length logs; (3) stripping the branches from the logs; (4) dragging the logs to a pickup point;

(5) grading and sorting the logs; (6) stacking the logs at a landing point; and (7) loading the logs onto trucks for further use or processing.

Petitioner chose to take the seven steps described in the preceding paragraph, rather than attempting to sell the damaged trees in place to a third party. Once it performed the seven steps, its options were to (1) attempt to sell the partially processed damaged trees to a third party; or (2) complete the processing of the damaged trees in its own plants in the ordinary course of its business. Petitioner chose the latter and completed the processing itself.

Petitioner relies on section 1033 for involuntary conversion treatment (deferral of gain).[4] Petitioner did not realize income from harvesting and processing the damaged trees until it sold the products it manufactured from the damaged trees. Petitioner is seeking to defer only that portion of the gain attributable to the difference between its basis and the fair market value of the damaged trees as of the time its salvage of them began; that is, the value petitioner contends would have been recognized if it

---

[4] Petitioner on its returns mistakenly claimed involuntary conversion treatment under sec. 631(a) due to its pro forma use in prior years' returns in which sec. 631(a) treatment had been properly elected and claimed. Petitioner concedes that sec. 631(a) treatment is not available based on the fact that it did not have a sec. 631(a) election in place during the years in issue. For the 1992 taxable year, one of petitioner's subsidiaries made a valid sec. 631 election, but the subsidiary was liquidated at the end of the 1992 calendar year. With that exception, petitioner and its subsidiaries were not entitled to sec. 631 treatment for the taxable years 1992 through 1995.

had sold the damaged trees on the open market instead of further processing and/or milling the damaged trees into finished products. Petitioner further contends that it is not attempting to defer any portion of the gain attributable to the processing, milling, or finishing of products.[5] Respondent determined that petitioner understated income by improperly deferring gain from the sale of the end product of the damaged trees, as follows: 1992--$647,953; 1993--$2,276,282; 1994--$3,592,035; and 1995--$4,831,462.

Discussion

The specific question we consider is whether petitioner is disqualified from electing deferral of gain under section 1033 because it processed damaged trees into end or finished products

---

[5] Based on a hypothetical example presented by petitioner, the majority of the gain deferred would appear to be attributable to the difference between the fair market value of the damaged trees and petitioner's basis. Petitioner posed a hypothetical example which included the premises that the damaged trees had a $100 basis and a $475 selling price if sold in place. If the damaged trees were processed into logs, the processing cost would be $25 resulting in a $500 selling price. Petitioner further posits that the cost of milling timber is $100 and that a finished product would have a $610 selling price, resulting in $10 of gain from milling. Petitioner argues that, under this hypothetical, respondent would have allowed a deferral of the $375 gain if petitioner had sold the damaged trees in place. Petitioner contends that respondent has denied any deferral whatsoever, even though the milling of timber into a final product adds only $10 of additional gain in the context of petitioner's hypothetical. We consider here only whether petitioner is entitled to use sec. 1033. The parties have left to another day the question of the amount of gain to be deferred if petitioner's motion for partial summary judgment is granted. See infra note 6.

rather than being compelled simply to sell the damaged trees.[6]

Respondent contends that under section 1033 the realization of gain must stem directly or solely from the damage and the involuntary conversion. More particularly, respondent asserts that petitioner's conversion was not "involuntary" because damaged trees were processed into end products in the ordinary course of its business. Respondent points out that section 1033 is a relief provision which does not or should not include petitioner's situation; i.e., where the damaged trees are processed in the same manner as undamaged trees. Finally, respondent contends that section 1033 was not intended for the long-term deferral of profits from petitioner's timber processing and manufacturing business.[7]

Petitioner argues that its factual situation complies literally with the requirements of section 1033 allowing deferral of gain realized from salvaging its damaged trees. Specifically,

---

[6] The parties have isolated this issue from other unresolved issues, including petitioner's substantiation of the quantity and value of the damaged trees; the amount of gain realized from sale of damaged trees; the amount of gain that may be deferred; and the determination of the correct year(s) for deferring the gain.

[7] Respondent's contention appears to address the possibility that petitioner reinvested the proceeds (and deferred gains) from the sale of the damaged trees in replacement property in the form of relatively young trees, thereby resulting in lengthy deferral of the subject gains. Respondent's contention, however, is more properly directed at the question of whether petitioner reinvested the proceeds in qualified replacement property, a question which is not at issue in the cross-motions for partial summary judgment.

petitioner contends that it was compelled (in order to avoid further damage or loss) to salvage (process) the damaged trees resulting in an involuntary conversion within the meaning of section 1033.  Petitioner also points out that the conversion was "involuntary" because the damaged trees were not scheduled for harvest at the time of the damage.  In response to respondent's argument, petitioner contends that its choices for salvaging the damaged trees should not preclude deferral of the portion of the gain that it was compelled to realize on account of the damage to its trees.  Petitioner emphasizes that it is not attempting to defer gain from processing and/or milling the damaged trees.  Petitioner seeks to defer only that portion of the gain attributable to the difference between its basis in the damaged trees and their fair market value at the time the process of salvaging the trees began.

Section 1033[8] provides, under certain prescribed
circumstances, for relief from taxpayer's gains realized from
involuntary conversion of property.  The relief provided for
under section 1033 is deferral of the gain from involuntary
conversion, so long as the proceeds are used to acquire qualified
replacement property.

The purpose of section 1033 was described, as follows:

> The purpose of the statute is to relieve the taxpayer
> of unanticipated tax liability arising from involuntary
> * * * [conversion] of his property, by freeing him from
> such liability to the extent that he re-establishes his

---

[8] Sec. 1033 provides, in pertinent part, as follows:

(a) SEC. 1033(a).  General Rule.--If property (as a result
of its destruction in whole or in part, theft, seizure, or
requisition or condemnation or threat or imminence thereof) is
compulsorily or involuntarily converted--

       *     *     *     *     *     *     *

    (2) Conversion into money.--Into money or into property
not similar or related in service or use to the converted
property, the gain (if any) shall be recognized except to
the extent hereinafter provided in this paragraph:

        (A) Nonrecognition of gain.--If the taxpayer
during the period specified in subparagraph (B), for
the purpose of replacing the property so converted,
purchases other property similar or related in service
or use to the property so converted, or purchases stock
in the acquisition of control of a corporation owning
such other property, at the election of the taxpayer
the gain shall be recognized only to the extent that
the amount realized upon such conversion (regardless of
whether such amount is received in one or more taxable
years) exceeds the cost of such other property or such
stock.  Such election shall be made at such time and in
such manner as the Secretary may by regulations
prescribe.  * * *

prior commitment of capital within the period provided by the statute. The statute is to be liberally construed to accomplish this purpose. On the other hand, it was not intended to confer a gratuitous benefit upon the taxpayer by permitting him to utilize the involuntary interruption in the continuity of his investment to alter the nature of that investment tax free. * * *

Filippini v. United States, 318 F.2d 841, 844 (9th Cir. 1963).

The earliest predecessor of section 1033 was section 214(a)(12) of the Revenue Act of 1921, ch. 136, 42 Stat. 227 (1921 Act). Except for certain modifications not pertinent to the question we consider, the purpose and substance of section 214(a)(12) of the 1921 Act was the same as the version of section 1033 under consideration in this case.

Only a limited amount of legislative history has accompanied the enactment of the various involuntary conversion relief provisions since 1921. The House and Senate reports issued in connection with section 214(a)(12) of the 1921 Act explained that the relief "permits the taxpayer to omit or deduct the gains involuntarily realized, when he proceeds forthwith in good faith to invest the proceeds of such conversion in the acquisition of similar property or in establishment of a replacement fund therefor." H. Rept. 350, 67th Cong., 1st Sess. 12 (1921), 1939-1 C.B. (Part 2) 168, 177; accord S. Rept. 275, 67th Cong., 1st Sess. 15 (1921), 1939-1 C.B. (Part 2) 181, 191.

From that limited legislative history, it can be gleaned

that Congress intended relief from involuntary conversions only to the extent of the "proceeds of such conversion", and expected taxpayers to acquire replacement property within a reasonable time. Obviously, relief was intended only where the conversion was involuntary. Although Congress was concerned about the timeliness and "good faith" of efforts in seeking replacement property, there was no explanation or particular focus upon the use of damaged assets in the taxpayer's business.

Where the complete destruction or loss of property has occurred, there has been only a limited amount of litigation about whether a taxpayer should be allowed to defer the attendant gain.[9] Where the destruction or loss to property is partial, however, additional questions have arisen.

In C.G. Willis, Inc. v. Commissioner, 41 T.C. 468 (1964), affd. 342 F.2d 996 (3d Cir. 1965), the taxpayer's ship was damaged in a 1957 collision, and the insurance company paid $100,000 to the taxpayer. The insurance payment was approximately $9,000 less than the taxpayer's basis in the ship, and, accordingly, no gain was realized for 1957. In 1958, however, the taxpayer sold the damaged, but unrepaired, ship for an amount which exceeded the remaining basis by approximately $86,000. Under those circumstances, it was held that the 1958

_____

[9] More often, the controversies focus upon which property had been converted and/or the definition of "replacement property."

sale was not an "involuntary conversion" within the meaning of section 1033 so that the gain had to be recognized and could not be deferred. In so holding, it was explained that the damage to the taxpayer's ship was insufficient to compel the taxpayer to sell and, accordingly, the sale was not involuntary. Id. at 476. In that setting, "involuntary conversion" under section 1033 was defined to mean "that the taxpayer's property, through some outside force or agency beyond his control, is no longer useful or available to him for his purposes." Id.; see also Wheeler v. Commissioner, 58 T.C. 459, 462-463 (1972) (where it was held that the taxpayer's choice to destroy his building was not an involuntary conversion).

In S.H. Kress & Co. v. Commissioner, 40 T.C. 142, 153 (1963), we held that condemnation of the taxpayer's property was imminent and unavoidable, and that the only realistic alternatives were to either await condemnation or to sell to an appropriate buyer. We found that those circumstances met the "compulsorily or involuntarily converted" requirement of section 1033, (citing Masser v. Commissioner, 30 T.C. 741 (1958)). Accordingly, even though a taxpayer has choices or alternatives a disposition may be deemed involuntary so that section 1033 relief remains available.

Masser v. Commissioner, supra, involved section 112(f)(1) of the Internal Revenue Code of 1939 (another predecessor of section

1033).  In <u>Masser</u>, the taxpayer operated an interstate trucking business from two proximately positioned pieces of business realty that were used as part of a single economic unit.  One of the properties was subject to imminent condemnation, but the taxpayer sold both parcels.  In that circumstance, we held that both pieces of realty were involuntarily converted and the gain from both could be deferred.

Those cases reveal two general elements as being necessary to qualify for deferral of gain under section 1033.  First, a taxpayer's property must be involuntarily damaged, and second the property must no longer be available for the taxpayer's intended business purposes for the property.

The Commissioner issued a revenue ruling that specifically focused on whether gain from the sale of trees damaged by a hurricane qualified under section 1033.  In that ruling it was held that the gain on sale of uprooted trees was "voluntary" and, in addition, that there was no direct conversion into money in the circumstances expressed in the ruling.  See Rev. Rul. 72-372, 1972-2 C.B. 471.  The principal rationale for the holding of Rev. Rul. 72-372, <u>supra</u>, was that the hurricane did not cause the conversion of the trees into cash or other property directly resulting in gain from the damage.

In a second ruling, however, the 1972 ruling was revoked. See Rev. Rul. 80-175, 1980-2 C.B. 230.  The 1980 ruling permitted

deferral of gain from the sale of damaged trees.  The factual

predicate for both rulings was as follows:

> the taxpayer was the owner of timberland.  As a result
> of a hurricane, a considerable number of trees were
> uprooted.  The timber was not insured, and once downed,
> was subject to decay or being rendered totally
> worthless by insects within a relatively short period
> of time.  The taxpayer was, however, able to sell the
> damaged timber and realized a gain from such sale.  The
> proceeds of the sale were used to purchase other
> standing timber.

The rationale articulated in Rev. Rul. 80-175, supra, is

that gain is "postponed on the theory that the taxpayer was

compelled to dispose of property and had no economic choice in

the matter" and that the taxpayer "was compelled by the

destruction of the timber to sell it for whatever the taxpayer

could or suffer a total loss."  Id., 1980-2 C.B. at 231.

Accordingly, the taxpayer in the 1980 ruling was found to have

met the two part test; i.e., that the damage was involuntary and

the timber was no longer available for the taxpayer's intended

business purpose.  Most significantly, the 1980 ruling eliminated

the requirement that the damage-causing event convert the

property directly into cash or other property.

The 1980 ruling also contained a comparison with the holding

in C.G. Willis, Inc. v. Commissioner, supra, as follows:

> In the present case, the downed timber was not
> repairable and was generally no longer useful to the
> taxpayer in the context of its original objective.  The
> destruction caused by the hurricane forced the taxpayer
> to sell the downed timber for whatever price it could

get. Unlike the situation in <u>Willis</u>, the sale of the downed timber was dictated by the damage caused by the hurricane. [Rev. Rul. 80-175, <u>supra</u>, 1980-2 C.B. at 232.]

The taxpayer in the 1980 ruling apparently intended to grow trees and/or hold timberland for sale at a particular maturity. The hurricane caused the taxpayer to involuntarily sell/use the trees prior to the time intended for harvest or sale. The taxpayer's intended purpose or use was only affected as to timing, and the sale was prior to the time the taxpayer intended to sell or harvest.

Returning to the disagreement here, petitioner contends that, at the time of the damage, it did not intend to harvest the damaged trees, so that the conversion was involuntary and within the meaning of the statute.[10] Petitioner argues that a taxpayer may not have a choice as to <u>whether</u> to dispose of damaged property, but a taxpayer may have a choice as to <u>how</u> to dispose of damaged property.

Respondent contends that petitioner should not be entitled to such deferral because of its choice to further process the

---

[10] Petitioner also relies on the published revenue rulings and on a number of private letter rulings (PLRs), which it contends permitted sec. 1033 deferral in factual circumstances substantially similar to those we consider here. On brief, the parties devoted a relatively large portion of their arguments to discussing the PLRs. Although we have considered the rationale used by the parties in discussing the rulings, the parties and the Court are statutorily proscribed from citing the PLRs as precedent. See sec. 6110(k)(3).

trees into logs or finished products, its original intention. Respondent's position in this case is a reversion to the requirement of the 1972 ruling that the sale (conversion to cash) be the direct result of the damage-causing event. For more than 21 years, the Commissioner's ruling position has permitted section 1033 deferral even though the conversion is not directly into cash.

Petitioner in this case is effectively no different from the taxpayer in the 1980 ruling.[11] Petitioner's conversion was involuntary, and petitioner was forced to act or suffer complete loss of the damaged trees. Section 1033 could be interpreted to permit either a direct or an indirect conversion. The case law permits indirect conversion, but the Commissioner's 1972 ruling denied relief because the trees damaged by the hurricane were sold by the taxpayer. The Commissioner, in revoking the 1972 ruling has permitted, since 1980, section 1033 relief where there is a sale (a voluntary act) of the damaged property. Respondent has denied relief here because petitioner processed rather than sold the damaged trees.

The critical factor is that petitioner was compelled to harvest the damaged trees prior to the time it had intended. The

---

[11] Respondent has not argued that the 1980 ruling was not in accord with sec. 1033 or the case law. Respondent's position in this case, however, does not comport with the outcome or reasoning of the 1980 ruling.

possibility that the partial damage to petitioner's trees might have been relatively small or resulted in a nominal amount of reduction in gain is not a reason to deny relief. In addition, if petitioner's salvage efforts were more successful than other taxpayers that is not a reason for denial of relief under section 1033.

Petitioner's circumstances fulfill the statutory purpose and intent. There was unanticipated tax liability due to various casualties that damaged the trees. Petitioner seeks to defer the gain that was occasioned by the damage and which it had reinvested in like property. Petitioner had not planned to harvest the damaged trees. Identical to the taxpayer's situation in the 1980 ruling, petitioner's trees were damaged by forces without its control, and petitioner was compelled to salvage its damaged trees prior to the intended date for harvest, sale, and/or processing into end products. Unlike the taxpayer in C.G. Willis v. Commissioner, supra, petitioner was forced to salvage (process or sell) the damaged trees or suffer a total loss.

Respondent's attempt to distinguish petitioner's situation from the ruling does not reconcile with the rationale of the 1980 ruling, the underlying statute, and case law. The taxpayer in the ruling and petitioner were both forced to salvage the damaged trees or suffer the imminent and total loss of the damaged trees. The taxpayer in the ruling and petitioner were prematurely forced

to salvage (sell or use) the damaged trees.  The damaged trees were used in their businesses, but not in the same manner as they would normally have done.  In the 1980 ruling, the taxpayer was forced to sell the trees under unintended business conditions.  Likewise, petitioner was forced to use the damaged trees, albeit in its manufacturing process, under unintended business conditions; i.e. before maturity and/or before the time at which the trees would normally be ready for efficient harvest.

Respondent also argues that petitioner is not entitled to defer gain because "there were no actual sales of damaged timber."  Respondent argues that section 1033 requires a sale or conversion of the damaged property into money or property similar in use to the damaged property.  Section 1033 simply requires that property be involuntarily converted into money or property.  There is no requirement, as argued by respondent, that the deferred gain be derived in a particular manner; i.e., only from a distress sale.  Based on the holding of Rev. Rul. 80-175, 1980-2 C.B. 230, it is unlikely that respondent would have questioned the deferral of gain if petitioner had been forced to sell the damaged trees in place.[12]

---

[12] If we were to approve respondent's approach, taxpayers, who were unable to sell damaged assets without some additional processing would be denied sec. 1033 relief.  That distinction could not have been intended and certainly was not expressed in the legislation.

Finally, respondent contends that section 1033 was intended to provide relief for taxpayers who experience "destruction [of property] in whole or in part". Although respondent agrees that petitioner had a casualty, damage to the trees, and petitioner was compelled to salvage them, respondent infers that petitioner's situation is somehow not directly affected by the destruction. Respondent contends that petitioner's gain is voluntary or not caused by the damage because petitioner is able to process the logs into finished products.

Admittedly, petitioner's circumstances may appear more favorable than might have been expected after a "casualty", but the statute does not have a quantitative threshold. Petitioner is not seeking a windfall in the form of the deferral of gain from processing and/or making the finished products. Nor is petitioner attempting to "utilize the involuntary interruption in the continuity of his investment to alter the nature of that investment tax free." Filippini v. United States, 318 F.2d at 844. Petitioner is seeking to defer the unexpected gain that resided in trees that it had not, at the time of the damage, intended to harvest and to reinvest that gain in trees that will fulfill petitioner's intended purpose.[13] Such deferral was the

---

[13] Contrary to the import of respondent's argument, petitioner did not intend to harvest trees that happen to become diseased or damaged. Petitioner intended to efficiently and

(continued...)

intended purpose for the enactment of section 1033.

Respondent argues that the purpose of section 1033 may be better served where a taxpayer is unable to process damaged property into the taxpayer's usual product(s).  But that disability is not a threshold for relief or a requirement of the statute.  Section 1033 is a relief provision, and we are to construe it liberally to effect its purpose.  Davis v. United States, 589 F.2d 446, 450 (9th Cir. 1979); Asjes v. Commissioner, 74 T.C. 1005, 1014 (1980).[14]

Respondent would have this Court impose its own judgment as to which taxpayer deserves relief.  So, for example, if a taxpayer, like the one in the 1980 ruling, was growing trees for eventual sale, relief is available even though the taxpayer sells the damaged trees to its usual customers.  Under respondent's suggested approach, petitioner would not be entitled to relief because it had choices other than sale; i.e., to further process the damaged trees.  Petitioner, under respondent's approach,

---

[13](...continued)
systematically harvest trees and to maximize its profit.  It was not petitioner's intent to randomly cull and process trees that happened to become damaged.

[14] Respondent also argues that, if petitioner is entitled to sec. 1033 relief in the circumstances of this case, the "narrowly tailored relief provision" will become difficult to administer (with respect to the deferral aspects) and permit relief whether or not it is needed.  These arguments, made for purposes of emphasis, do not persuade us that the statute withholds relief in this situation.

would be deprived of relief from involuntarily generated gain merely because of happenstance. Under that type of reasoning, petitioner would be denied relief merely because it was a grower of trees and also a manufacturer of products using trees, whereas a similarly situated grower of trees without the ability to use the damaged trees to make products would be entitled to relief, even though its damaged trees might ultimately be manufactured into products by others. The line respondent asks us to draw would be illusive and a matter of conjecture.

Petitioner was growing its trees for harvest when they reached a certain maturity. The damage occurred outside of petitioner's control and forced petitioner to salvage its trees earlier than intended. That situation is indistinguishable from the circumstances set forth in Rev. Rul. 80-175, 1980-2 C.B. 230, where the taxpayer's trees were felled by a hurricane. The fact that the damage was sufficiently partial so as to result in a substantial amount of deferral is not a reason, under the statute, to deny relief.

We read the statute in light of respondent's Rev. Rul. 80-175, supra, which has been outstanding for 22 years.

In view of the foregoing,

Appropriate orders will be issued.