T.C. Memo. 2014-79


UNITED STATES TAX COURT


PALMER RANCH HOLDINGS LTD., PALMER RANCH
HOLDINGS, INC., TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17017-11.                    Filed May 6, 2014.


<u>Mark F. Hearne, II</u>, <u>Debra Albin-Riley</u>, and <u>Meghan Largent</u>, for petitioner.

<u>Michael Kramarz</u>, <u>Sergio Garcia-Pages</u>, and <u>Andrew Michael Tiktin</u>, for

respondent.


CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4

    I.     Zoning Designations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7
    II.    Rezoning History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8
    III.   Environmental Concerns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10
    IV.   Road Access. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13
    V.    Conservation Easement Valuation. . . . . . . . . . . . . . . . . . . . . . . . . . . *14

**[\*2]** OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15

I.     Burden of Proof.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15
II.    The Conservation Easement's Value. . . . . . . . . . . . . . . . . . . . . *15

       A.     Before-and-After Method.. . . . . . . . . . . . . . . . . . . . . *16
       B.     Highest and Best Use. . . . . . . . . . . . . . . . . . . . . . . . *22

             1.     Failed Rezoning History. . . . . . . . . . . . . . . . . *23
             2.     Environmental Concerns. . . . . . . . . . . . . . . . . . *28
             3.     Road Access.. . . . . . . . . . . . . . . . . . . . . . . . *32
             4.     Neighborhood Opposition. . . . . . . . . . . . . . . . *35
             5.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . *36

       C.     Real Estate Market. . . . . . . . . . . . . . . . . . . . . . . . . *36

             1.     Before Value. . . . . . . . . . . . . . . . . . . . . . . . *36
             2.     After Value.. . . . . . . . . . . . . . . . . . . . . . . . *39

       D.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . *41

III.   Accuracy-Related Penalty.. . . . . . . . . . . . . . . . . . . . . . . . . . *41

       A.     Preliminary Matters. . . . . . . . . . . . . . . . . . . . . . . . . *42

             1.     Jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . *42
             2.     Burden of Production.. . . . . . . . . . . . . . . . . . *43

       B.     40% Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . *44
       C.     20% Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . *45

             1.     Professional Advisers. . . . . . . . . . . . . . . . . . . *47
             2.     Necessary and Accurate Information. . . . . . . . *48
             3.     Actual Reliance in Good Faith. . . . . . . . . . . . *48

IV.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *49

**[\*3]**        MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  This case is a partnership-level proceeding under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, as amended.  The TEFRA partnership, Palmer Ranch Holdings Ltd. (Palmer Ranch), claimed a $23,942,500 charitable contribution deduction on its 2006 Form 1065, U.S. Return of Partnership Income.  Respondent issued a notice of final partnership administrative adjustment (FPAA) to petitioner, Palmer Ranch Holdings, Inc., as tax matters partner, disallowing $16,965,000 of the deduction and imposing an accuracy-related penalty under section 6662.[1]  After concessions,[2] the issues for decision are as follows:

(1)  whether Palmer Ranch overstated the fair market value of its conservation easement donation.  We hold that it did, but we hold the correct fair market value is not as low as respondent determined; and

(2)  whether Palmer Ranch is liable for an accuracy-related penalty.  We hold that it is not.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The parties stipulated and agreed that Palmer Ranch made a qualified conservation contribution and secured a qualified appraisal.

**[\*4]**                                   FINDINGS OF FACT

Some of the facts have been stipulated for trial under Rule 91. The

stipulation of facts and the attached exhibits are incorporated by this reference and

are found accordingly. At the time the petition was filed, Palmer Ranch's

principal place of business was in Florida.

Hugh Culverhouse owned about 98% of Palmer Ranch, while his wholly

owned corporation Palmer Ranch Holdings, Inc., owned the remainder. Palmer

Ranch owns the Palmer Ranch Development of Regional Impact (DRI),[3] which is

in Sarasota County, Florida. Within the DRI are two parcels of land we will refer

to throughout this opinion: parcel B-9 and parcel B-10.

Parcel B-9 is an undeveloped parcel that consists of 39.02 acres and lies

immediately to the north of parcel B-10. Parcel B-10 is the subject property of

this valuation dispute. Parcel B-10 is an irregularly shaped, undeveloped parcel of

land consisting of 82.19 acres. The parcel's general topography includes upland

developable acreage as well as wetlands, natural or man made ponds, pinewood

flats, and mesic hammocks. Additionally, bald eagle nest SA-010 (eagle nest) is

---

[3]A DRI is defined as a development which, because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county. Fla. Stat. Ann. sec. 380.06(1) (West 2014).

[*5] on the eastern portion of parcel B-10. In 1991 the board of county commissioners (BOCC) approved the eastside environmental systems analysis for Palmer Ranch (eastside analysis). The eastside analysis proposed a wildlife corridor system for the east side of the DRI. The wildlife corridor was intended to provide open space for an eagle flyway, and it provided a habitat for small urban animals. Parcel B-10 is subject to the provisions of the eastside analysis because it is on the east side of the DRI.

Mr. Culverhouse desired that a portion of the undeveloped property in the DRI remain undeveloped and preserved for public use, conservation, and open space. This desire led Mr. Culverhouse to encumber parcel B-10 with a conservation easement and donate the easement to Sarasota County, Florida, on December 19, 2006 (valuation date). The land is now used for a public park, a community garden, a conservation area, and preserved open space.

Before making this contribution, Palmer Ranch retained a tax attorney to advise it on how to donate the easement in compliance with the Internal Revenue Code. The attorney retained Chad Durrance, a licensed appraiser, and WilsonMiller, a land planning and engineering firm. On the basis of WilsonMiller's land use analysis and Mr. Durrance's appraisal, Palmer Ranch

**[*6]** donated a perpetual conservation easement with restrictions providing that the land could be used only for conservation purposes, public use, and open space.

Mr. Durrance appraised the conservation easement at $23,940,000 (i.e., $307,000 per acre) in December 2006. Mr. Durrance based his conclusion on his analysis of various comparable properties that sold for prices between $237,200 per acre and $510,600 per acre. Mr. Durrance further supported his conclusion on WilsonMiller's land use analysis.

WilsonMiller concluded that Parcel B-10 would be approved for a 360-unit multifamily development upon application around December 2006 because the development was confined to the improved pastures, which do not contain the native habitats protected by the wildlife corridor. Moreover, the environmentally sensitive areas, such as the wildlife corridor and the eagle nest zone, were going to be left as open space because the land use regulations allow for clustering--i.e., development is concentrated or clustered on the developable portions of Parcel B-10. WilsonMiller further concluded that its plan was consistent with the DRI master development order,[4] Sarasota County's governing land planning regulations, and Sarasota County's comprehensive plan and future land use map.

---

[4]A master development order governs the overall development of a DRI.

[*7] I.     Zoning Designations

Sarasota County's zoning regulations provide an official zoning atlas that designated Parcel B-10 as residential estate-1 (RE-1) in 2006, which limited current development to 41 units (i.e., one unit per two acres). Florida law requires local governments to adopt comprehensive plans to guide future development and growth in each of Florida's counties. Sarasota County's comprehensive plan includes a future land use map, which designates the maximum future zone capacity of property in Sarasota County. At all relevant times, the future land use map indicated Parcel B-10 had a moderate density residential (MDR) zone designation (i.e., two to five units per acre).

Rezoning petitions to change the designation in the zoning atlas are permitted as long as the proposed rezoning is consistent with the comprehensive plan and complies with the zoning regulations. The Sarasota County zoning regulations define density as "the maximum number of residential dwelling units permitted per gross acre of land." The WilsonMiller land use plan indicated that Parcel B-10 could be rezoned to allow development of 360 dwelling units, which equates to a gross density of about 4.38 units per acre. This is more than the RE-1 zone designation allows, but is consistent with the MDR zone designation.

**[*8]** In order to rezone and develop an increment of land, an applicant must submit a development application and a separate rezoning application to Sarasota County. The process entails the following: (1) a preapplication meeting with County staff, (2) holding a neighborhood workshop with adjacent property owners, (3) submitting the applications to the County, which entails staff review, (4) public hearings by a lay body (planning commission), and (5) a public hearing by the BOCC wherein the BOCC will take final action. Even though the BOCC issues a final determination, it is still subject to the circuit court's review. For parcel B-10 to receive rezoning approval, the applications must be consistent with the DRI master development order, the comprehensive plan, zoning regulations, and land development regulations.

## II.   Rezoning History

In 2003 Palmer Ranch agreed to sell to Pulte Homes (Pulte), a national home developer, approximately 86.9 acres in parcels B-9 and B-10. The contract was contingent on Pulte's receiving a favorable determination from Sarasota County to rezone and develop 240 dwelling units on the land.[5]

---

[5]The original plan was to develop 156 units on parcel B-9 and 84 units on parcel B-10.

**[*9]**  Pulte submitted both development and rezoning applications to Sarasota County.  The applications encompassed approximately 86.35 acres of parcels B-9 and B-10.  However, Pulte's applications did not include the protective zone (eagle nest zone) around the eagle nest on parcel B-10's east side.  The original rezoning application sought to change the zone designation on parcels B-9 and B-10 from RE-1 (i.e., one unit per two acres) to residential single family (RSF)-2/PUD (i.e., 3.5 units per acre).

In June 2004 the BOCC considered Pulte's two applications to develop and rezone the property.  The BOCC voted three to two to deny approval for the development application.  Pulte requested, and was granted, a continuance to revise its development plan.  The rezoning application was not voted on.

In July 2004 Palmer Ranch and Pulte amended their purchase agreement to drop parcel B-10.  In August 2004 Pulte submitted a revised development application and a revised rezoning application for parcel B-9 only.  This rezoning application sought to change the zone designation from RE-1 (i.e., one unit per two acres) to residential multifamily (RMF)-1/PUD (i.e., six units per acre).  The BOCC considered Pulte's two revised applications in October 2004 and voted three to two to deny both applications.  The BOCC issued Ordinance 2004-055

[*10] denying the development application and Resolution 2004-258 denying the rezoning application.

The BOCC stated in Ordinance 2004-055 that the following changes would be necessary to allow for a favorable consideration:

> Present an amended * * * Application for development approval * * * setting forth development plans which includes both Parcel B-9 and B-10 (totaling 86.35 acres+/-) in accordance with the Master Development Order, the Sarasota County Comprehensive Plan, and the Sarasota County Land Development Regulations for Parcel B-9; this application should include Parcel B-10 and should endeavor to keep Parcel B-10 in tact [sic] as it relates to the Eagle Preservation Area, the wetlands, and the wildlife corridor.

The denial was never appealed. In November 2004 Pulte terminated its agreement to purchase parcel B-9.

III.    Environmental Concerns

The comprehensive plan states as a policy that Sarasota County shall support State and Federal agencies in implementing protection guidelines related to listed species--e.g., listed as endangered or threatened. The U.S. Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission provide regulations for bald eagle protection. In 1991 the bald eagle was listed as an endangered species. The DRI master development order was amended in 1991 to include an eagle nest zone and a wildlife corridor.

[*11] In 1991 the eagle nest had a primary protection zone of 900 feet and a secondary protection zone of 1,800 feet, with some extended protection to the west of the nest. The primary protection zone was designed as open space where development was not permitted. Development in the secondary protection zone was limited to single-family homes. In 1995 the bald eagle's status was dropped from "endangered" to "threatened". In 1996 the primary and secondary protection zones surrounding the eagle nest were reduced to 750 feet and 1,500 feet, respectively, with some extended protection to the west of the nest. In 2003 the extended protection to the west was eliminated; the protection zones remained at a uniform 750 feet and 1,500 feet, respectively.

In 2003 the U.S. Fish and Wildlife Service determined that the bald eagles using the eagle nest on parcel B-10 appeared to be tolerant of the traffic and noise generated by the surrounding residences and roadways. Though the BOCC ultimately denied Pulte's residential development proposal on parcel B-10 in 2004, the U.S. Fish and Wildlife Service determined in 2003 that Pulte's proposal was in compliance with the bald eagle regulations.

In June 2006 the U.S. Fish and Wildlife Service issued a clearance letter stating that it had proposed to remove the bald eagle from the list of threatened and endangered species because the bald eagle population had recovered. The

**[*12]** clearance letter also eliminated the secondary protection zone and reduced the primary protection zone surrounding the eagle nest to 660 feet. Building construction at any height was not permitted in the 660-foot primary protection zone. The WilsonMiller Plan as of the valuation date included all of parcel B-10 (including the eagle nest zone) and proposed no development on the area within a 660-foot radius around the eagle nest zone.

Besides the eagle nest, another concern in developing parcel B-10 is the wildlife corridor. The wildlife corridor was primarily a flyway for eagles to reach the ocean, but it also considered other animals common in Sarasota, such as rabbits, squirrels, and raccoons. Parcel B-10 is within the wildlife corridor.

The wildlife corridor extended into a neighboring parcel of land known as the Hamptons. The Hamptons is a 114.5-acre subdivision to the east of parcel B-10. When the Hamptons subdivision was approved for residential development, the wildlife corridor designation was removed from a portion of the parcel to allow for the development. That portion was a part of the then-existing 900-foot primary protection zone around the eagle nest in 1991. The wildlife corridor designation has not been removed from any portion of parcel B-10, but there are still significant developable areas on the land.

**[*13]** IV.     Road Access

In Sarasota County, residential developments of 100 dwelling units or more must have two fully functional access points unless the county engineer or the BOCC grants a variance.

Sarasota County's land development regulations seek to maintain neighborhood interconnectivity.  In particular they provide that there shall be a continuation of the existing street patterns and coordination of the street systems among adjoining subdivisions to facilitate traffic flow through communities.  The land development regulations state:  "Street stubs to adjoining areas shall be provided when required to give access to such areas or to provide for future traffic circulation."  Sarasota County, Fla., Ordinance No. 97-051, Subdivision Technical Manual para. A(3)(e) (July 1, 1997).

Sawyer Loop Road lies to the north of parcel B-10, across parcel B-9. McIntosh Road lies to the west of parcel B-10, across the legacy trail.  Parcel B-10 does not front Sawyer Loop Road or McIntosh Road.  Ridge Road lies in the Stonebridge subdivision to the south of parcel B-10.  Ridge Road has a stubbed-out access point at parcel B-10's southern border.[6]

---

[6]A stubbed-out road is configured to have a temporary turnaround (or "bulb out") until a neighborhood is developed on the adjoining property and a street is

(continued...)

**[\*14]** V.    Conservation Easement Valuation

There was prior litigation involving parcel B-10 in the Court of Federal Claims. Rogers v. United States, No. 07-273 (consolidated) (Fed. Cl. Filed May 1, 2007). The judge in those cases determined that undeveloped land in the DRI (including parcel B-10) was worth $200,000 per acre as of April 2004. See Childers v. United States, 112 Fed. Cl. 617 (2013). The prices for residential real estate in Sarasota County were increasing during 2004 and 2005 but peaked in late 2005. There was a subsequent softening in demand but no notable nosedive or decrease in value in 2006.

Andres Bolano, Jr., was Palmer Ranch's accountant and oversaw the preparation of Palmer Ranch's 2006 tax return. The return shows a charitable contribution deduction of $23,940,000 for the donated easement and $2,500 for a cash donation. Mr. Bolano included with the 2006 return Mr. Durrance's real estate appraisal and WilsonMiller's land use analysis to support the deduction for the donated easement. Palmer Ranch timely filed its 2006 tax return. Respondent issued an FPAA to petitioner on May 2, 2011, disallowing $16,965,000 of the

---

[6](...continued)
connected. Because it is a stubbed-out road, there is no lot or house at the future connection point to the adjoining property.

[*15] deduction and asserting a section 6662 penalty. Petitioner timely filed its petition with this Court for readjustment.

OPINION

I.      Burden of Proof

Generally the Commissioner's determination is presumed correct, and the taxpayer bears the burden of proving by a preponderance of the evidence that the determination is incorrect. See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). While section 7491(a) may place the burden of proof upon the Commissioner in certain circumstances, the parties agree that it does not operate to shift the burden in this case, because Palmer Ranch exceeds the net worth requirement. Sec. 7491(a)(2)(C). Regardless, we need not consider the burden of proof, because the outcome of this case is determined on the preponderance of the evidence. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

II.     The Conservation Easement's Value

Under section 170 taxpayers may claim charitable contribution deductions for the fair market value of property they donate. Taxpayers generally cannot

[*16] claim deductions for donations of partial property interests, but there is an exception for qualified conservation contributions. See sec. 170(f)(3)(B)(iii). Respondent concedes that Palmer Ranch made a qualified conservation contribution; he disputes only the fair market value of the contributed property.

### A. Before-and-After Method

Generally, the charitable contribution amount is the contributed property's fair market value at the time it is contributed. Sec. 1.170A-1(a), (c)(1), Income Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

Where a substantial record of comparable easement sales exists, the donated easement's fair market value is based on the comparable easements' sale prices. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. However, where there is no established market for similar conservation easements, the regulations provide another method to determine fair market value:

> [T]he fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

**[*17]** Id.  See generally Hilborn v. Commissioner, 85 T.C. 677, 688-689 (1985).

The parties' appraisers agree that no established market for conservation easements exists in this case and that the "before-and-after" method is the best way to value the easement.  Under this method, appraisers measure the difference in property value before and after the easement was granted.

An appraiser may use the comparable sales method, or another accepted method, to estimate the before and after values of the property.  Hilborn v. Commissioner, 85 T.C. at 689.  An appraiser using the comparable sales method is required to find property sales that meet three criteria:  (1) the properties themselves are similar to the subject property; (2) the sales are arm's-length transactions; and (3) the sales have occurred within a reasonable time of the valuation date.  Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).  Both parties' appraisers used the comparable sales method as a basis for their before and after valuations.

Petitioner's appraiser, Mr. Durrance, used eight comparables.  Respondent's appraiser, Bradley Page, used four of the same comparables, plus another.  We will confine our review to the four agreed-upon comparables:

[*18]

| Comparable | Sale date | Purchase price | Size (acres) | Price per acre |
|------------|-----------|----------------|--------------|----------------|
| 1 | 1/2006 | [1]$40,000,000 | 78.34 | $510,600 |
| 2 | 1/2005 | 9,110,000 | 38.40 | 237,200 |
| 3 | 4/2005 | 9,062,500 | 17.88 | 507,000 |
| 4 | 3/2005 | 4,350,000 | 15.38 | 282,800 |

[1]Amounts are rounded to the nearest hundred.

The parties agree that comparable 1 is the only true comparable. Comparable 1, just under 80 acres, is outside of the DRI, and sold in 2006 for $40 million, or $510,600 per acre. Mr. Durrance concluded parcel B-10 had a before value of $25,200,000, or $307,000 per acre, while Mr. Page concluded the before value was $7,750,000, or $94,000 per acre. Despite their agreement on selecting comparable properties, the two appraisers differ greatly in their before value estimates--ranging from $7.7 million to $25.2 million.

Both appraisers calculated the before value using research on and analysis of parcel B-10 including its size, shape, and location; an analysis of comparable properties; road access from surrounding communities; environmental restrictions on the property; and zoning designations on the property.

[*19] Both parties recognized that parcel B-10 was similar in size and shape to comparable 1. Comparable 1 had 51 acres of developable land that allowed for a maximum of 352 dwelling units ranging from single-family to townhome-style residential. In contrast, Mr. Page determined that parcel B-10 had only 26 acres of developable land running from the northern to the southern boundary in the western portion of parcel B-10. This, he concluded, limited development to a range of 72 to 100 dwelling units. He also determined these dwelling units were limited to single-family homes because parcel B-10 had a current zone designation of RE-1 (i.e., one unit per two acres).

Mr. Durrance's appraisal accounts for greater development potential on parcel B-10 and, accordingly, ascribes greater value to the property. Mr. Durrance recognizes that the current zoning of parcel B-10 is RE-1 (i.e., one unit per two acres), but he also observes that the Sarasota County comprehensive plan permitted a higher zoning designation, MDR (i.e., two to five units per acre). Because the Sarasota County zoning regulations permit cluster development, Mr. Durrance believed multifamily dwelling units would be permitted in parcel B-10. See Sarasota County, Fla., Code of Ordinances, app. A, art. 6, secs. 6.5.1, 6.6.1 (Oct. 22, 2003). In the appraisal, Mr. Durrance notes that the current low-density zoning is an interim zoning that is historically typical of undeveloped acreage in

[*20] the DRI. Mr. Durrance determined that the most important consideration in determining a property's development potential is to consider the future land use designation in the Sarasota County comprehensive plan. Therefore, Mr. Durrance assumed the property could be developed with two to five units per acre, or a total of 164-410 units. He also found this determination consistent with the surrounding residential development. Mr. Durrance's appraisal observed that the Sarasota County zoning map shows parcels B-9 and B-10 surrounded by higher density zoning districts.

Another factor differentiating the appraisals is the relevance of Pulte's 2004 development proposal on the combined property of parcels B-9 and B-10 (excluding the eagle nest zone). Pulte proposed to develop 240 single-family residential units, 84 of which would have been on parcel B-10. Pulte later amended the application to remove parcel B-10 from the proposal, so that only parcel B-9 was before the BOCC. The BOCC ultimately rejected the application in 2004. Mr. Page reviewed Ordinance 2004-055, which conveyed the BOCC's denial, as well as the transcripts from the BOCC hearing. Mr. Page concluded that this prior rejection was an indication that the BOCC would not approve the type of development which was the basis of Mr. Durrance's appraisal. Mr. Durrance,

[*21] however, did not give any value to the outcome of this previous development proposal, because it was a two-year-old development denial on parcel B-9 only.

"We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment." Parker v. Commissioner, 86 T.C. 547, 561 (1986). Furthermore, "[w]e may embrace or reject expert testimony, whichever, in our best judgment, is appropriate." Chiu v. Commissioner, 84 T.C. 722, 734 (1985). "'Valuation is * * * necessarily an approximation.' It is an inexact science at best, capable of resolution only by 'Solomon-like' pronouncements." Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 408 (1986) (alteration in original) (citations omitted).

In deciding the property's fair market value before the encumbrance, we must take into account not only the property's then-current use, but also its highest and best use. See id. at 400; sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934); Hilborn v. Commissioner, 85 T.C. at 689. This presents a problem of judgment, not mathematics. Stanley Works & Subs. v. Commissioner, 87 T.C. at 408. If different from the current use,

**[\*22]** a proposed highest and best use requires "closeness in time" and "reasonable probability". Hilborn v. Commissioner, 85 T.C. at 689. The dispute here hinges on parcel B-10's highest and best use because the parties do not agree on whether Palmer Ranch's proposed use is reasonably probable.

B.     Highest and Best Use

A property's "highest and best use" may be defined as "'the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.'" Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 331 (2012) (quoting Appraisal Institute, The Appraisal of Real Estate 277-278 (13th ed. 2008)). The most significant dispute here is whether it is reasonably probable that 360 multifamily dwelling units could have been developed on parcel B-10 around December 2006.

Respondent contends that the existing RE-1 (i.e., one unit per two acres) zone designation reflected parcel B-10's highest and best use. Anything exceeding that designation, he argues, was not reasonably probable. Petitioner maintains that a rezoning of the property to the MDR (i.e., two to five units per acre) zone designation found in Sarasota County's comprehensive plan is reasonably probable.

**[\*23]** Respondent argues that a zoning change for parcel B-10 was not reasonably probable given four factors: (1) the failed rezoning history, (2) environmental concerns, (3) limited access to outside roads, and (4) neighborhood opposition. We address each of these arguments in turn.

### 1. Failed Rezoning History

Respondent contends that the failed rezoning history relative to Parcel B-10 is evidence that it could not be rezoned and developed in accordance with the MDR designation. We disagree.

In 2003 Palmer Ranch entered into a sale contract with Pulte. Palmer Ranch conditionally agreed to sell to Pulte approximately 86.9 acres that combined parcel B-9 and a portion of parcel B-10. The agreement was conditioned on Pulte's receiving a favorable determination from Sarasota County to rezone and develop 240 dwelling units on the combined property. The original rezoning application sought to rezone the land from RE-1 (i.e., one unit per two acres) to RSF-2/PUD (3.5 units per acre). The BOCC denied Pulte's development application by a three-to-two vote in June 2004 but granted Pulte's request to continue proceedings pending a development plan revision. Pulte amended its purchase agreement with Palmer Ranch in July to drop parcel B-10. In August, Pulte submitted a revised application to the BOCC for development and rezoning of parcel B-9 only. In

[*24] October 2014 the BOCC voted three to two to deny the revised applications. This denial was later conveyed in Ordinance No. 2004-055 and Resolution No. 2004-258.

Respondent argues that petitioner's appraiser did not give due consideration to this rezoning history. Respondent cites three cases to support his contention that petitioner's proposed rezoning is speculative at best. See Lakewood Assocs. v. Commissioner, 109 T.C. 450, 459 (1997), aff'd without published opinion, 173 F.3d 850 (4th Cir. 1998); Envtl. Pres. Co. v. Commissioner, T.C. Memo. 1992-100; Estate of Jennings v. Commissioner, T.C. Memo. 1976-152. However, the cases respondent relies on are distinguishable from this case.

In Lakewood the taxpayer purchased land that it planned to develop as residential property. When purchased, the land was zoned for agricultural use. The taxpayer applied for rezoning in 1988 and was denied in 1989. Also in 1989, new Federal wetland regulations reclassified most of the land as wetlands. The taxpayer claimed a loss deduction for 1989 for the decrease in property value. We held that the new regulations did not deny the taxpayer the right to develop the land that it previously possessed, because the taxpayer was denied a rezoning that same year. The rezoning history in Lakewood was much more relevant because

[*25] rezoning was denied in the year at issue. Here, however, the rezoning history is over two years old and concerns a different land segment.

In Estate of Jennings the taxpayer died in September 1971 owning land that was zoned for single-family dwellings on two-acre lots. The estate valued the land at $500,000 on its tax return. The Commissioner argued the land was worth $1 million because the decedent had entered into a contract in 1970 to sell the land for $1 million. That contract was contingent upon the buyer's obtaining a zoning change to permit commercial construction. The contract was not consummated, because the buyer's rezoning application was denied in 1972 (after the valuation date). We held that there was no assurance that the land could be rezoned, because there were significant issues barring a rezoning.

Respondent cites Estate of Jennings in arguing that there is no assurance the parcel B-10 rezoning will be successful. However, as we discuss below, we do not believe the environmental concerns respondent raises substantially limit Palmer Ranch's ability to have parcel B-10 rezoned. Also, as discussed in this section, Pulte's previous failure to have parcel B-9 rezoned does not demonstrate that an attempt to rezone parcel B-10 would necessarily fail.

In Envtl. Pres. Co., the Commissioner determined that the taxpayer-partnership overstated the value of its real property charitable contribution on its

[*26] tax return. The taxpayer argued that the land's highest and best use was as a deep water marine terminal. It based this determination in part on its investigation of ports on similarly situated properties. In holding for the Commissioner, we stated that the issue is not how other ports have used such property, but whether the proposed use is likely for this particular property in the near future. There were extensive wetlands on the taxpayer's land. However, the taxpayer did not offer any evidence regarding the wetlands' effect on the reasonable probability of its proposed development. The taxpayer also failed to establish that demand existed in the area for development in the reasonably near future. As we discuss below, petitioner presented credible evidence showing that it accounted for the effect the eagle nest zone, the surrounding wetlands, and the wildlife corridor would have on the rezoning and development of parcel B-10.

Respondent maintains that Ordinance 2004-055 is a legally binding document that shows a historical rezoning and development denial for parcel B-10 and therefore depresses the value of parcel B-10. We recognize that the ordinance is authoritative, but we also note its diluted value.[7] The ordinance is a document embodying the BOCC's 2004 determination and is entitled to a degree of

---

[7]As discussed infra, the ordinance is subject to interpretation. Respondent, however, overstates the ordinance's importance on the basis of his reliance on reams of hearsay evidence found in the BOCC meeting minutes.

[*27] consideration. However, the BOCC made its determination two years before the year at issue and it applied to parcel B-9 only. Pulte removed parcel B-10 from the rezoning and development applications before the BOCC denied them. The BOCC addressed parcel B-10 in the ordinance only to advise Pulte to "endeavor to keep parcel B-10 in tact [sic] as it relates to the Eagle Preservation Area, the wetlands, and the wildlife corridor." We discuss the meaning of this statement infra. Nothing in the ordinance forecloses the possibility that Palmer Ranch could have successfully had parcel B-10 rezoned.

The county comprehensive plan established an MDR (i.e., two to five units per acre) zone designation in the future land use map for parcel B-10. We recognize that this is not a guarantee of higher density zoning,[8] but it does show that such a rezoning is legally permissible. Because our caselaw states that legal permissibility is not enough, we must also ascertain whether it was reasonably probable that the BOCC would have approved rezoning parcel B-10.

---

[8]FLU Policy 2.3.4. of the comprehensive plan states: "The present use of land may, by the Zoning Atlas, continue to be more limited than the future use designated on the Future Land Use Map." "Although a zoning change may be consistent with the comprehensive plan, the landowner is not presumptively entitled to such use." Miami-Dade Cnty. v. Walberg, 739 So. 2d 115, 117 (Fla. Dist. Ct. App. 1999).

[*28] Because the ordinance did not involve a denial for parcel B-10, we look to the June 2004 denial that did relate to parcel B-10. Pulte's 2004 development application for the combined property between parcels B-9 and B-10 (excluding the eagle nest zone) in June 2004 was denied by a three-to-two vote. The separate application for rezoning the combined property was continued and thus no vote took place.

The June 2004 denial related only to a portion of parcel B-10. That portion did not include the eagle nest zone. Looking at that denial in conjunction with the ordinance, we believe the BOCC was concerned that the development application did not consider the nearby eagle nest zone, wetlands, and wildlife corridor. Moreover, that June 2004 denial (as well as the ordinance) was the result of a three-to-two vote. The closeness of the vote suggests that the BOCC's decision could have changed over time, especially when a later application protects the eagle nest zone, the wetlands, and the wildlife corridor. Accordingly, this rezoning history does not eliminate the reasonable probability on the valuation date of a successful rezoning.

2.    Environmental Concerns

The comprehensive plan states as a policy that Sarasota County shall support State and Federal agencies in implementing protection guidelines related

**[\*29]** to listed species.[9]  In 1991 eagles were an endangered species.  The DRI master development order was amended in 1991 to include an eagle nest zone and a wildlife corridor.  The wildlife corridor was primarily a flyway for eagles to reach the ocean, but it also served other animals common in Sarasota County.  Parcel B-10 is within the wildlife corridor.

Respondent argues that, with exception for some minor infringements, residential structures are generally not permitted in the wildlife corridor.  He argues that the express terms of Ordinance 2004-055 make this point clear.

Ordinance 2004-055 stated that one of the necessary changes for a favorable determination was that the developer should "endeavor to keep Parcel B-10 in tact [sic] as it relates to the Eagle Preservation Area, the wetlands, and the wildlife corridor."  What exactly the BOCC meant by keeping parcel B-10 intact is unclear from the record.  Respondent contends it means that the land must not be developed, while petitioner argues moderate development is permitted so long as the development does not encroach on the concerned lands.  We agree with petitioner.

---

[9]See Sarasota County, Fla., Comprehensive Plan, ch. 2, ENV Policy 4.4.4, https://www.scgov.net/CompPlan/Comp%20Plan%20Amendments/Chapter%202%20-%20Environment.pdf.

**[*30]** The two parties argue over the meaning of "intact". Respondent argues "intact" means "untouched, especially by anything that harms or diminishes". Webster's New Collegiate Dictionary 375 (1977). Petitioner argues "intact" means "complete or whole". Random House Dictionary of the English Language 2nd Unabridged (1987).

The BOCC was considering an application to rezone and develop only parcel B-9 when it issued Ordinance 2004-055. In denying that application the ordinance stated that the developer needed to amend the application to include parcel B-10 and keep it intact as it related to the eagle nest zone, the wetlands, and the wildlife corridor.

Recall that Pulte originally submitted an application for development on parcels B-9 and B-10 (<u>excluding</u> the eagle nest zone), which was denied. Pulte then submitted a revised plan that included only parcel B-9, which resulted in a denial and the ordinance requiring inclusion of parcel B-10. Given this context, we believe the phrase "keep Parcel B-10 in tact [sic] <u>as it relates to</u> the Eagle Preservation Area, the wetlands, and the wildlife corridor" (emphasis added) was meant to keep those environmental concerns in the picture when development plans were submitted. Clearly, the BOCC was concerned about developers

[*31] planning construction near environmentally sensitive areas without giving those areas due consideration.

The WilsonMiller Plan as of the valuation date included all of parcel B-10 (including the eagle nest zone) and proposed development only on the improved pasture land, leaving the 660-foot radius surrounding the eagle nest zone as open space.  Therefore, this development plan addresses the BOCC's concern, and its approval is reasonably probable.

Looking to the Hamptons subdivision, we find further support for the probability that the BOCC would approve residential development in a wildlife corridor.  The Hamptons was built in a wildlife corridor on a tract of land adjoining parcel B-10, near the eagle nest.  When the BOCC approved residential development in the Hamptons subdivision, the wildlife corridor designation was removed from a portion of the parcel to allow for that development.  That portion was also part of the then-existing 900-foot primary protection zone around the eagle nest in 1991.  Moreover, respondent's own land use planner recognized that there are significant developable areas in the wildlife corridor.

Accordingly, the wildlife corridor does not decrease the reasonable probability of a successful rezoning.

**[*32]**          3.          Road Access

In Sarasota County, residential developments of 100 dwelling units or more must have two fully functional access points unless the county engineer or the BOCC grants a variance.

Respondent contends that it was not reasonably probable that a developer could have built multifamily dwelling units on parcel B-10, because the land does not abut either an arterial or collector road.[10]  Multifamily dwellings are approved only in areas having convenient access to both arterial and collector roads. Respondent further states that future parcel B-10 residents would be required to travel across parcel B-9 or through the Stonebridge subdivision to access parcel B-10.  These are two options respondent contends are not possible even though his own appraiser states:  "The subject site is accessed from Ridge Road that ends in a cul-de-sac within the Stonebridge single family subdivision south of the subject, and from Sawyer Loop Road through parcel B-9 adjacent to the north of the subject."

---

[10]Sarasota County defines an arterial road as one that facilitates long trips at higher operating speeds than collector or local roads.
  Sarasota County defines a collector road as one that collects and distributes traffic at moderate and low operating speed with more accessibility to adjacent properties than arterial roads.

**[*33]** Respondent agrees that Ridge Road provides a legal means of access to parcel B-10, but he contends that neighborhood opposition would have limited its access to emergency use only. He argues that it is reasonable to assume that the residents of Stonebridge would have made factually based arguments on the valuation date considering their fervor and organization against Pulte's proposed development on parcels B-9 and B-10 in 2004. See Miami-Dade Cnty. v. Walberg, 739 So. 2d 115 (Fla. Dist. Ct. App. 1999) (holding that neighborhood opposition supported by facts may constitute substantial competent evidence to deny a proposed development).

We disagree with respondent for a number of reasons. As stated below, neighborhood opposition alone will not preclude development. Moreover, respondent's position requires three assumptions: (1) that Stonebridge residents would object to parcel B-10's ingress and egress over Ridge Road, (2) that any possible objection would be a factually based argument strong enough to preempt such access, and (3) that the BOCC would find merit in the argument. We are not prepared to adopt these assumptions.

[*34] Furthermore, Sarasota County's land development regulations seek to maintain neighborhood interconnectivity.[11] In particular they provide that there shall be a continuation of the existing street patterns and coordination of the street systems among adjoining subdivisions to facilitate traffic flow through communities. The land development regulations state: "Street stubs to adjoining areas shall be provided when required to give access to such areas or to provide for future traffic circulation." Sarasota County, Fla., Ordinance No. 97-051, Subdivision Technical Manual para. A(3)(e) (July 1, 1997). Consistent with this policy, a public residential street was "stubbed out" in the Stonebridge neighborhood to provide future access to parcel B-10. The stubbed-out road demonstrates a general expectation that future residents of parcel B-10 would use the road to access their homes. Therefore, this road provides one access point for the land.

A northern access point to parcel B-10 is also possible through parcel B-9 to Sawyer Loop Road. Respondent argues that this access point is not possible without an additional cost to the hypothetical willing buyer to purchase an access

---

[11]See Sarasota County, Fla., Comprehensive Plan TRAN Policy 1.3.10, https://www.scgov.net/CompPlan/Comp%20Plan%20Amendments/Chapter%206%20-%20Transportation.pdf; see also Sarasota County, Fla., Ordinance No. 97-051, Subdivision Technical Manual para. A(3)(d) (July 1, 1997).

[*35] easement across parcel B-9. However, parcels B-9 and B-10 were under common ownership on the valuation date. If Mr. Culverhouse and Palmer Ranch wanted to sell parcel B-10 at its maximum value, it had to have two fully functional access points. They could have granted an easement across parcel B-9 to the purchaser with little cost to themselves. The necessity of granting an easement across parcel B-9 would not significantly diminish the value of parcel B-10.

Palmer Ranch could have easily given parcel B-10 the requisite road access to allow for residential development. Accordingly, this factor does not decrease the probability that it could have been rezoned.

### 4. Neighborhood Opposition

Respondent contends that neighborhood opposition is another factor that would prevent parcel B-10 from being rezoned. For support, respondent recalls neighborhood opposition to the 2004 Pulte rezoning attempt; however, as stated above, that rezoning application related to a different land segment--parcels B-9 and B-10 (exclusive of the eagle nest zone). It did not involve parcel B-10 alone in its entirety. Even if we were to assume this rezoning would face neighborhood opposition, to find it effective we would again have to make the three assumptions we identified above in our road access discussion. We do not make those

[*36] assumptions, and we accordingly find that the potential for neighborhood opposition does not bar the reasonable probability of a successful rezoning.

### 5.    Conclusion

In accordance with our above findings, there is a reasonable probability that parcel B-10 could have been successfully rezoned to allow for the development of multifamily dwellings.  Therefore, the highest and best use of the property is development for multifamily dwellings.  We now turn to respondent's argument that Palmer Ranch's valuation is too high because there was a softening in the real estate market around the valuation date.

### C.    Real Estate Market

The parties agree that the prices for residential real estate in Sarasota County were increasing during 2004 and 2005.  However, respondent contends that the real estate market in 2006 was not as positive as petitioner's $25.2 million before value suggests.  We assess petitioner's valuation below.

### 1.    Before Value

Petitioner argues parcel B-10 had a $25.2 million fair market value before the land was encumbered.  Respondent argues it was $7.75 million.  The primary differences between the appraisals result from their zoning determinations and their selected comparison measure.

[*37] Mr. Durrance used MDR (i.e., allows 164 to 410 homes) as the appropriate zone designation and gross acreage as his comparison measure. Mr. Page used RSF-2/PUD (i.e., allows 72 to 100 homes) as his zone designation and density units as his comparison measure. On the basis of our analysis above, MDR was the more appropriate zone designation. We also think gross acreage was the appropriate comparison measure because the Sarasota County zoning regulations define density as "the maximum number of residential dwelling units permitted per gross acre of land." Sarasota County, Fla., Ordinance No. 2003-052, app. A, art. 10, sec. 10.2 (October 22, 2003) (emphasis added). Because Mr. Durrance used a gross acreage comparable measure based on the MDR zone designation, we believe Mr. Durrance's appraisal is more accurate.

We also find compelling that both appraisers used four of the same comparables, yet only Mr. Durrance's appraisal is within the selected comparables' price-per-acre range. We understand that appraisers must make adjustments, but Mr. Page's were excessive given that he claimed the properties he selected were "comparable". Though we find Mr. Durrance's appraisal more accurate, it is not without fault.

There was prior litigation involving parcel B-10 in the Court of Federal Claims. See supra p. *14. The judge in those cases determined that undeveloped

**[*38]** land in the DRI (including parcel B-10) was worth $200,000 per acre as of April 2004.  See Childers v. United States, 112 Fed. Cl. 617.  Using that price as a starting point, Mr. Durrance states that a market condition (or time) adjustment must be made to account for the trend of increasing land values.  He estimates that the value of parcel B-10 was about $300,000 per acre in December 2006.  As support for his estimate, Mr. Durrance provides alternative calculations:  (1) apply a 2.7% monthly appreciation rate to $200,000 for 21 months (April 2004 through December 2005) or (2) apply a 1.5% monthly appreciation rate to $200,000 for 33 months (April 2004 through December 2006).

Mr. Durrance borrowed these alternative time adjustment calculations from the Government's appraiser (John Underwood) in the Rogers case.  However, Mr. Durrance's use of these calculations is incomplete.  Mr. Underwood stated in his Rogers appraisal that there was a 2.7% per month increase in values from 2004 to 2005.  However, he said appreciation rates for raw land lag behind those for developed land, so he used a 1.5% per month adjustment for Palmer Ranch's undeveloped land.  Parcel B-10 is raw land, so we believe the 1.5% per month time adjustment is appropriate.

Mr. Durrance applied the 1.5% appreciation factor over 33 months, ending in December 2006.  Citing numerous newspaper articles reporting a 2006 third-

[*39] quarter decline in housing prices, respondent argues the appreciation rate is too high. On cross-examination, Mr. Durrance stated that the real estate market peaked in late 2005. He stated there was a softening in demand, but no notable nosedive or decrease in value in 2006. According to his own admission, Mr. Durrance should not have applied a steady 1.5% appreciation factor to parcel B-10 for the months after the market hit its peak in 2005. Even if property values did not decline in 2006, we think they likely stagnated. Accordingly, we will reduce petitioner's appraisal by the amount of 2006 appreciation Mr. Durrance calculated. This results in a "before value" of $21,005,278.

## 2. After Value

To calculate the after value, Messrs. Durrance and Page looked to recent sales of encumbered properties. However, neither relied on these sales comparisons because each conservation easement had restrictions specifically tailored to its particular situation that made a comparison impractical.

Both appraisers analyzed the restrictions of the conservation easement to determine the impact it would have on parcel B-10. The easement permitted limited development for a nature park or recreational improvements such as campgrounds, swimming pools, and athletic fields. It also permitted agricultural uses such as breeding, raising, and grazing cattle. Except as otherwise permitted,

[*40] the easement restricted construction, dumping, mining, excavation, vegetation removal, billboard and advertisement displays, and industrial or commercial use.

Both appraisers agree that the conservation easement severely limits the marketability of parcel B-10 and, therefore, significantly reduces its value. Both appraisers estimated the property's after value at 10% or less of its before value. Mr. Page appraised encumbered parcel B-10 at 10% of its unencumbered value, while Mr. Durrance appraised it at 5% of the unencumbered value.

The two appraisals are relatively close in their estimations, and we see no significant error in either appraiser's conclusions. We believe reasonable minds may disagree when it comes to providing estimates such as these. "'Valuation is * * * necessarily an approximation.' It is an inexact science at best, capable of resolution only by 'Solomon-like' pronouncements." Stanley Works & Subs. v. Commissioner, 87 T.C. at 408 (alteration in original) (citations omitted). However, we find Mr. Durrance's estimate more accurate.

As encumbered, the land could be used for agricultural or recreational use. Respondent looked at three encumbered properties that were used for agricultural purposes that ranged in size from 1,035 to 1,860 gross acres. Parcel B-10 is only 82.19 acres and surrounded by an urban community. We therefore do not see

[*41] much value in using parcel B-10 for agricultural purposes as its size and location do not lend itself to this type of use. Thus, we must determine how valuable parcel B-10 is when used for recreational purposes.

The size and location of parcel B-10 are appropriate for developing a nature park, campground, or swimming pool. However, these developments are limited to a potential purchaser that is either a nonprofit organization or the State of Florida. This already shallow buyer pool is further reduced because any potential buyer must also be willing to carry out these developments subject to the easement's restrictions. Therefore, we agree with Mr. Durrance and will use 5% of the unencumbered value as the appropriate percentage to value parcel B-10 in its encumbered state. Accordingly, the after value of parcel B-10 is $1,050,264.

D.    Conclusion

Under the before-and-after valuation method, we calculate the fair market value of the easement by subtracting the property's after value from its before value. On the basis of analysis above, we hold the conservation easement's fair market value is $19,955,014 (i.e., $21,005,278 – $1,050,264).

III.   Accuracy-Related Penalty

Respondent determined that the underpayment of tax resulting from the adjustment of partnership items was attributable to a gross valuation misstatement,

**[*42]** as defined in section 6662(h)(2), and therefore imposed a 40% penalty.

Alternatively, respondent imposed a 20% penalty because he determined that the

underpayment of tax was attributable to one or more of the following:

(1) negligence or disregard of rules or regulations, (2) a substantial understatement

of income tax, or (3) a substantial valuation misstatement.[12] See sec. 6662(a) and

(b)(1), (2), and (3).

    A.    <u>Preliminary Matters</u>

        1.    <u>Jurisdiction</u>

Under the TEFRA framework, a court in a partnership-level proceeding like

this one has jurisdiction to determine the applicability of any penalty which relates

to an adjustment to a partnership item. Sec. 6226(f); <u>United States v. Woods</u>, 571

U.S. ___, ___, 134 S. Ct. 557, 559 (2013) ("TEFRA authorizes courts in

partnership-level proceedings to provisionally determine the applicability of any

penalty that could result from an adjustment to a partnership item, even though

imposing the penalty requires a subsequent, partner-level proceeding."). Whether

---

[12]The Commissioner may not stack or compound alternative grounds for the sec. 6662 penalty to determine a penalty greater than the maximum of 20% on any given portion of an underpayment, or 40% if such portion is attributable to a gross valuation misstatement. Sec. 1.6662-2(c), Income Tax Regs.

**[\*43]** there is a substantial or gross valuation misstatement in the partnership context is determined at the partnership level. Sec. 1.6662-5(h)(1), Income Tax Regs.

## 2. Burden of Production

Under section 7491(c), the Commissioner has the burden of production in any court proceeding with respect to the liability of any individual for any penalty imposed by the Code. However, section 7491(c) does not shift the burden of proof, which remains on the taxpayer. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Petitioner relies on section 7491(c) to support its argument that respondent bears the burden of justifying any penalty in this case. However, section 7491(c) is not as clear as petitioner states. It is not entirely instructive whether that section imposes the initial burden on the Commissioner when the taxpayer is an entity that has petitioned this Court under section 6226. By its terms, section 7491(c) applies only to the liability of "any individual" for penalties.[13] See Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104 ("Plainly, by using the different

---

[13]In contrast, sec. 7491(a), which provides the general rule for shifting the burden of proof to the Commissioner in certain circumstances, applies in ascertaining the liability of a "taxpayer".

**[*44]** terms 'individual' and 'taxpayer', Congress intended to distinguish the two terms.").

We need not resolve any potential uncertainty; even if we assume that respondent has the initial burden of production, we are satisfied that he has carried it. Therefore, the burden remains with petitioner to prove the penalty determinations are incorrect. Higbee v. Commissioner, 116 T.C. at 446-447.

Respondent has made several alternative penalty determinations. We address each below.

B.  40% Penalty

Under section 6662(h), a taxpayer may be liable for a 40% penalty on any portion of an underpayment of tax attributable to a gross valuation misstatement. A gross valuation misstatement exists if the value or adjusted basis of any property claimed on a tax return is 200% or more of the amount determined to be the correct amount of such value or adjusted basis. Sec. 6662(h)(2)(A)(i) (modifying subsection (e)(1)(A)).

Palmer Ranch claimed a $23.94 million charitable contribution deduction on its 2006 return. As stated above, $19,955,014 is the correct value of the conservation easement. That is about a 20% overstatement. Therefore, there was

**[\*45]** no gross valuation misstatement, and a 40% penalty under section 6662(h) is inappropriate.

  C. <u>20% Penalty</u>

  Under section 6662(a) and (b)(1)-(3), a 20% accuracy-related penalty shall be imposed on any portion of an underpayment of Federal income tax attributable to one or more of the following: (1) negligence or disregard of rules or regulations, (2) a substantial understatement of income tax, or (3) a substantial valuation misstatement.

  Section 6664(c) provides a reasonable cause exception to the accuracy-related penalty. Generally, under section 6664(c)(1), the section 6662(a) accuracy-related penalty is not imposed if the taxpayer acted with reasonable cause and in good faith. However, the reasonable cause exception does not apply to a substantial valuation overstatement with respect to charitable contribution property unless the claimed value was based on a "qualified appraisal" by a "qualified appraiser" and the taxpayer made a good-faith investigation of the contributed property's value. Sec. 6664(c)(2) and (3); <u>see also</u> sec. 1.6664-4(h), Income Tax Regs. Respondent concedes the appraisal requirement but argues that Palmer Ranch has not met the good-faith investigation requirement. We disagree.

[*46] Respondent's chief criticism of Palmer Ranch's efforts was that it did not inform its appraiser or tax return preparer of Ordinance 2004-055. While it is true that Messrs. Durrance and Bolano were not aware of the ordinance at the time the appraisal was prepared, we do not believe that omission shows a lack of good faith. Mr. Durrance testified that the ordinance would not have mattered to his appraisal, because the ordinance was a development denial for a different property in a different time period. Similarly, this omission would not have affected Mr. Bolano's tax return preparation, because he was not the appraiser.

Palmer Ranch retained a tax attorney to advise it on how to donate the easement in compliance with the Internal Revenue Code. The attorney further retained Mr. Durrance, a licensed appraiser, and WilsonMiller, a land planning and engineering firm. We have identified flaws in the appraisal, but they were not due to information contained in the omitted ordinance. We think these actions represent a good-faith attempt to determine the easement's value. Accordingly, Palmer Ranch may raise a reasonable cause defense for the tax underpayment.

Whether a taxpayer acted with reasonable cause and in good faith is determined on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the taxpayer's experience, knowledge, and education. Sec. 1.6664-4(b)(1), Income Tax Regs. "Generally, the most important

**[*47]** factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id. Reliance on professional advice may constitute reasonable cause and good faith, but only if, considering all the circumstances, such reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs.

Reasonable cause exists where a taxpayer relies in good faith on the advice of a qualified tax adviser where the following three elements are present: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see sec. 6664(c)(3).

### 1. Professional Advisers

Palmer Ranch retained an experienced tax attorney to advise it on how to donate the conservation easement in compliance with section 170(h). That attorney retained Mr. Durrance, who respondent stipulated was a qualified appraiser providing a qualified appraisal. Palmer Ranch also retained WilsonMiller to provide advice on the relevant land planning, zoning, and other

[*48] land use regulations relevant to the donated property. Respondent does not dispute that the conservation easement satisfied all the requirements for a qualified donation of a conservation easement as specified in section 170(h). Therefore, we have no trouble finding these advisers to have at least an adequate level of expertise.

### 2. Necessary and Accurate Information

There is some dispute as to whether Palmer Ranch provided the appraiser and the tax preparer with all necessary information. Messrs. Durrance and Bolano did not know about Ordinance 2004-055. However, as discussed above, this ordinance is not as critical as respondent contends, because it was outdated and dealt with a different land segment.

Therefore, we see no problem with the information Palmer Ranch provided the appraiser and the tax preparer.

### 3. Actual Reliance in Good Faith

Respondent contends that Palmer Ranch could not have relied on its advisers' analysis in good faith when it did not provide them with Ordinance 2004-055. Again, Ordinance 2004-055 is not as critical as respondent contends. Therefore, we do not find this fatal to a finding that Palmer Ranch acted in good faith in accepting this appraisal value as reasonable.

**[\*49]** We conclude that Palmer Ranch had reasonable cause and acted in good faith with respect to its underpayment for 2006. Accordingly, we hold that Palmer Ranch is not liable for the accuracy-related penalty.

IV.  Conclusion

Palmer Ranch overvalued the contributed conservation easement on parcel B-10 but is not liable for the accuracy-related penalty.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate decision will be entered.